IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NETGEAR, INC.,                          )
                                        )
                 Plaintiff,             )
                                        )
          v.                            )     C.A. No. 10-999 (SLR)
                                        )
RUCKUS WIRELESS, INC.,                  )
                                        )
                 Defendant.             )

### PLAINTIFF NETGEAR, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff NETGEAR, Inc.*

OF COUNSEL

Eric R. Lamison
Ryan J. Casamiquela
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
(415) 439-1400

Steven C. Cherny
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

March 26, 2013

**Table of Contents**

Page

I.   INTRODUCTION ......................................................................................................... 1

II.  ARGUMENT ................................................................................................................. 2

A.   The '531 Patent ....................................................................................................... 2

1.   "internetworking node"  (Independent Claim 6) ............................................. 3
2.   "wireless nodes" (Independent Claim 6) ......................................................... 4
3.   "first tier column" and "second tier column" (Independent Claim 6) ............. 5
4.   "topology broadcast messages" (Independent Claim 6) .................................. 6
5.   "means to analyze . . . and enter . . ." (Independent Claim 6) ........................ 8
6.   "means for analyzing . . . to determine . . ." (Independent Claim 6) .............. 8
7.   "means for marking registration status . . ." (Dependent Claim 7) ................ 9
8.   "means for broadcasting . . ." (Dependent Claim 8) ..................................... 10

B.   The '480 Patent ..................................................................................................... 10

1.   "optimal conditions" (Independent Claims 1 and 12) ................................... 11
2.   Subscriber Station Transmitter (Independent Claim 1/Dependent 13) .......... 13
3.   "bit error rate" (Dependent Claims 3 and 15) ............................................... 14
4.   "angularly diverse" (Independent Claim 12) ................................................. 14
5.   "means for monitoring RF data transmission frequencies" (Claim 12) ......... 15
6.   "means, responsive to said conditions, for selecting . . ." (Claim 12) .......... 16

C.   The '143 Patent ..................................................................................................... 17

1.   "gain control circuit" (Independent Claim 13) .............................................. 17
2.   "receiver gain" ............................................................................................... 18
3.   "periodicity" ................................................................................................... 19

D.   The '454 Patent ..................................................................................................... 19

1.   "fixed relationship" (Independent Claim 1) ................................................... 20
2.   "ascertaining a type of said interference" ...................................................... 20
3.   "interference is periodic" / "any periodicity of said interference" ................ 21
4.   "generating a data transmission pattern with a null in the direction of said interference"
     / "a data transmission antenna pattern with a null in the direction of said interference"
     (Claims 1/14) ................................................................................................. 21
5.   "narrow antenna beams" ................................................................................ 23
6.   "scanner" ........................................................................................................ 23

E.   The '035 Patent ..................................................................................................... 24

1.   "base station" (Claim 1) ................................................................................. 24
2.   "mobile station" (Claim 1) ............................................................................. 25
3.   means in the base station for determining which one of said multiple antennas received
     data most successfully . . . (Claim 1, abbreviated) ....................................... 26

i

4.    means in said at least one mobile station for selecting one of said multiple antennas in such mobile station as a preferred antenna. . . ...................................................................... 27

5.    a preferred antenna storage means in the base station and in at least one mobile station in which is stored indicia indicative of which antenna at such station is determined to be the preferred antenna ............................................................................................................... 27

6.    controller at said base station and said at least one mobile station . . ........................... 28

7.    "means for changing the preferred base station antenna . . ."........................................ 29

8.    ". . . means for measuring received signal strength . . ." (Dep. Claim 4) ..................... 29

9.    "includes error correction means to make a determination" (Claim 5) ........................ 30

**Table of Authorities**

Page

### Cases

*Emcore Corp. v. Optium Corp.*,
No. 6-1202, 2008 WL 3271553 (W.D.Penn. Aug. 5, 2008)....................................................... 13

*Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*,
209 F.3d 1337 (Fed. Cir. 2000) ................................................................................................ 25

*In re Katz Interactive Call Processing Patent Litig.*,
639 F.3d 1303 (Fed. Cir. 2011) ............................................................................................ 8, 10

*Inventio AG v. Thyssenkrupp Elevator Americas Corp.*,
649 F.3d 1350 (Fed. Cir. 2011) ........................................................................................... 24, 29

*Linear Tech. Corp. v. ITC*,
566 F.3d 1049 (Fed. Cir. 2009) ................................................................................................. 4

*MobileMedia Ideas, LLC v. Apple, Inc.*,
Civ. No. 10-258-SLR, 2012 WL 6044777 (D. Del. Nov. 8, 2012) ............................................ 2

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ................................................................................................. 4

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ............................................................................................. 2, 7

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
522 F.3d 1279 (Fed. Cir. 2008) ............................................................................................... 20

*Trading Tech. Intern., Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ............................................................................................... 12

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ................................................................................................. 4

## I.  INTRODUCTION

Ruckus Wireless, Inc.'s ("Ruckus") ZoneFlex and MediaFlex products infringe five U.S. patents through use of smart mesh networking topology tables, adaptive antennas, and related technologies.   Two of the patents, 5,812,531[1] (the "'531 Patent") and 5,507,035 (the "'035 Patent"), originally issued to IBM.  The pioneering '531 patent relates to nodes that can implement a wireless networking topology by using topology broadcast messages and topology tables to make informed registration decisions (forming wireless associations).  The '035 patent is an early patent in the adaptive antenna field.  The remaining infringed patents, 6,621,454 (the "'454 Patent"), 6,512,480 (the "'480 Patent) and 7,263,143 (the "'143 patent"), originally issued to Vectrad, one of the first companies to develop smart antenna and related technologies for enhancing use of the unlicensed RF spectrum for wireless local area data networks ("LANs"). That patented technology recently has become prevalent.  Previously most wireless companies focused on use of the licensed spectrum such as cellular telephone networks, which do not require the same intensive RF management to address interference and other issues.  FCC regulations limit those who can use licensed spectrum. The unlicensed spectrum is wide-open. The Vectrad patents are the forefront of high performance LANs using unlicensed RF spectrum.

Ruckus has unreasonably complicated claim construction through its indiscriminate identification of terms for construction and its vexatious indefiniteness proposals.  Specifically, Ruckus originally identified over *80 terms* for claim construction.  As required, NETGEAR served constructions for terms Ruckus proposed.  Ruckus, however, failed to provide claim constructions for many terms it identified.  Ruckus instead asserted that *29* terms were indefinite and asserted that *every asserted claim* from all five patents is invalid as indefinite.  Often,

---

[1] The Patents-in-Suit and their File Histories will be included in the Parties' Joint Appendix.

1

Ruckus asserted that every single limitation of a claim was indefinite, recklessly disregarding the presumption that the PTO does its job and issues presumptively valid claims. After the parties completed all fact and expert discovery, on the eve of the parties' filing their required Joint Statement (D.I. 112), Ruckus dropped a handful of its indefiniteness arguments and proposed untimely "plain meaning" constructions that give no guidance for terms. Where Ruckus actually has proposed claim constructions, its proposals try to import virtually every feature of the patents' preferred embodiments although the asserted claims do not include these features as limitations. Ruckus's approach to claim construction has been vexatious and driven by a desired result instead of coherent legal principles.

Consistent with precedent, NETGEAR proposes constructions for disputed terms rooted in intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *MobileMedia Ideas, LLC v. Apple, Inc.*, Civ. No. 10-258-SLR, 2012 WL 6044777, at *3 (D. Del. Nov. 8, 2012) (claim construction should focus on intrinsic evidence). Given Ruckus's various technical inaccuracies, NETGEAR also provides supporting testimony from an independent expert with over three decades of experience in wireless networking and antennas.[2] The Court should reject Ruckus's unprincipled approach and construe the claims as NETGEAR proposes.

## II.   ARGUMENT

### A.   The '531 Patent

The '531 Patent discloses technology that allows wireless nodes to be organized into an efficient wireless LAN, where neighboring nodes can communicate directly or indirectly. To form a network topology, wireless nodes broadcast network topology messages received by internetworking nodes. Internetworking nodes are also wireless nodes, and they may or may not

---

[2]   The Declaration of Dr. Simon Saunders, submitted herewith as Exhibit A, tracks with the organization of NETGEAR's brief.

2

have wired data connections. ('531 at 11:46-61.)  The internetworking node analyzes received topology broadcast messages to discover the network topology around itself, obtaining network addresses of wireless nodes from which it receives broadcast messages and addresses for other wireless nodes that the broadcasting wireless nodes are using for communication.  An internetworking node stores the address information in a topology table that it updates as it receives topology broadcast messages, using those messages and its topology table to decide whether to register (associate with) a wireless node according, for example, to a network hierarchy or link performance statistics. ('531 at 12:39; 9:28.)

### 1.    "internetworking node"  (Independent Claim 6)

NETGEAR construes "internetworking node" as a "node that is capable of relaying or forwarding messages between nodes in a network."  (D.I. 112 at p.6, 6(a).).  This matches the specification's description of an "internetworking node" as a node that can "directly relay a message from one wireless node to another wireless node, or forward such messages indirectly by first resending them to another such internetworking node which in turn resends the message to the other wireless node." ('531 at 3:6-10.)  Those are the basic internetworking services that an internetworking node provides.  Internetworking nodes can optionally provide more services that involve bridging wireless LANs to wired data networks, but they are not required to do so. Internetworking nodes can provide wireless internetworking services where they do not need to have wired network connections to wired LANs. ('531 at 11:45-61.)

Ruckus's construction adds limitations not found in the claims and in conflict with the specification. (D.I. 112 at p.6, 6(a).)  First, Ruckus argues that internetworking nodes must have a wired network adapter.  But, that is contrary to the specification and ***excludes*** expressly disclosed preferred embodiments of internetworking nodes communicating only wirelessly.  The

3

'531 specification discloses that devices called Access Points or "APs" can serve as internetworking nodes and that such nodes can be "wireless nodes" ('531 at 7:23-24 ("AP1 is the only *wireless node* within range of Node A"). The specification expressly teaches that "two APs do *not* need to be connected by wire, or form part of a wired LAN in order to provide the *internetworking services*" ('531 at 11:45-50) and expressly states that *"no wired network adapter would be required"* of APs providing "*internetworking services*" in such embodiments. ('531 at 11:60-61.) Ruckus improperly excludes these embodiments for no legitimate reason. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting interpretation that excludes disclosed examples).[3]

### 2.    "wireless nodes" (Independent Claim 6)

"Wireless nodes" are "nodes that are capable of transmitting and receiving messages wirelessly". (D.I. 112 at p. 7.) The claim language itself is clear and unambiguous. Further, the specification states that a "wireless node" includes a "wireless transmitter/receiver" for sending and receiving data. ('531 at Fig. 6; 5:25-27.) The specification similarly teaches that an internetworking node is a "wireless node" ('531 at 7:23-24 ("AP1 is the only *wireless node* within range of Node A")) having a wireless transmitter and receiver as shown in Figure 7.

Ruckus again tries to exclude "internetworking nodes" from being "wireless nodes" asserting that a wireless node "is not an internetworking node". Ruckus's proposed negative limitation is disfavored as a matter of law. (*See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-23 (Fed. Cir. 2003) (refusing application of a negative limitation absent an "express disclaimer or independent lexicography in the written description that would justify adding that negative limitation"); *see also Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1060 (Fed. Cir. 2009)

---

[3]    Ruckus's original construction improperly added a litany of further purported limitations, but Ruckus appeared to drop those in the Joint Statement. (*See* D.I. 112 at pp. 6-7, 6(a).)

(reversing claim construction including negative limitations).)  Further, as discussed above for

"internetworking node", the specification expressly discloses that "wireless nodes" can be

"internetworking nodes."  The specification expressly refers to an example of an internetworking

node, AP1, as a *"wireless node."*  ('531 at 7:23-24; *see also* 4:36-39, "Another aspect of the

invention provides for a method for internetworking between wireless nodes comprising the

steps of sending and receiving data between *wireless nodes, including internetworking nodes*.")

Moreover, the patent discloses internetworking nodes as wireless nodes that may communicate

*only* through the wireless medium. ("[T]wo APs do *not* need to be connected by wire, or form

part of a wired LAN in order to provide the *internetworking services*" ('531 at 11:45-50). *"[N]o*

*wired network adapter would be required*" of APs providing "*internetworking services*" in such

embodiments. ('531 at 11:45-61.)  Ruckus's construction conflicts with the specification.

### 3.    "first tier column" and "second tier column" (Independent Claim 6)

NETGEAR construes "first tier column" to mean "a first tier or column of a topology

table that stores network addresses of wireless nodes transmitting topology broadcast messages

received by at least one internetworking node."  (D.I. 112 at p. 7.)  The claim language *expressly*

provides for a "first tier column in which network address of wireless nodes transmitting

topology broadcast messages received by said at least one internetworking node are being

stored". ('531 at 14:54-57.)  NETGEAR's construction also matches the specification, which

states "the internetworking node listens for topology broadcasts" and "[u]pon receipt", updates

its table with the address for each node from which it received a broadcast.  ('531 at 12:62-65)

Ruckus, on the other hand, incorrectly asserts that the "first tier column" contains "the

addresses of wireless nodes that an access point can hear."  (D.I. 112 at p. 7.)  But claim 6 never

restricts nodes to "access points" nor requires storing "addresses of wireless nodes that the access

5

point can hear". It makes no mention of "access points" or "hearing". Rather, claim 6 merely

refers to storing addresses of wireless nodes from which topology broadcast messages are

received. Ruckus's construction also fails to include receiving topology broadcast messages or

storage of addresses from them in the "first tier column" in Claim 6's topology table. Ruckus

both ignores the claim language and improperly adds new and unsupported limitations.

NETGEAR construes a "second tier column" to mean "a second tier or column of a

topology table for storing network addresses of other wireless nodes that may be contained in

said topology broadcast messages." (D.I. 112 at p. 8.) This directly flows from the claim

language, which expressly provides for a "second tier column for storing network addresses of

other wireless nodes contained in said topology broadcast messages." ('531 at 14:57-60.) The

claim itself sets out what is in the second tier column, just as it does for the first tier column.

Further, the specification confirms that second tier refers to addresses of "other wireless nodes"

that are contained in topology broadcast messages. ('531 at 12:64-13:1, "and the address of

nodes within each node's topology broadcast.") There is no principled reason to vary these

terms as Ruckus proposes. Ruckus again incorrectly refers to nodes a first tier node can hear.

Claim 6 never refers to "hearing". It refers to received topology broadcast messages.

### 4.    "topology broadcast messages" (Independent Claim 6)

NETGEAR construes "topology broadcast messages" to mean "wireless messages

containing information relating to network topology." (D.I. 112 at p. 8.) It is clear from claim 6

and the '531 specification that "topology broadcast messages" are wireless messages sent from

wireless nodes that contain information relating to topology of a network. As for the contents of

topology broadcast messages, claim 6 expressly sets out what those messages contain. Further

definition of "topology broadcast messages" as a stand alone term, as Ruckus proposes, is not

6

needed.  Claim 6 itself provides in its elements of "a memory for storing a topology table . . . "

and "means to analyze the topology broadcast messages . . ." that "topology broadcast messages"

include: (1) addresses of wireless nodes that transmit broadcast messages; (2) addresses of other

wireless nodes contained in the topology messages broadcast by the first tier wireless nodes.

('531 at 14:54-67.)  NETGEAR's construction fits squarely within the language of claim 6.

Ruckus, on the other hand, completely rewrites the claim language to add a multitude of

limitations not found in claim 6.  Specifically, Ruckus proposes that a "topology broadcast

message" must include "the address of other nodes that have been heard during an interval" and

"the network addresses of nodes not hidden from a sending node".  (D.I. 112 at p. 8.) But these

features are not found in claim 6.  Nothing in claim 6 requires "intervals", nothing in claim 6

refers to "hearing" nodes, and claim 6 never refers to "hidden" nodes.  Ruckus improperly tries

to import alleged features of a preferred embodiment into claim 6 as new claim limitations.

Moreover, in so doing, Ruckus also ignores plain distinctions between claim 6 and other claims,

such as claim 14.  *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314, 1324-25 (Fed. Cir.

2005) (comparing independent claims and determining that a limitation of one claim would be

unnecessary if persons of skill in the art understood it was present in the other claim). Claim 14

includes terms regarding addresses of wireless nodes that selected wireless nodes "can hear" and

refers to periodically broadcasting.  ('531 at 15:49-16:7.)  In contrast, none of that language

appears in claim 6.  Instead, in claim 6 the topology broadcast messages provide receiving nodes

with the addresses of sending wireless nodes and addresses of others wireless nodes that the

sending wireless nodes have included in their broadcasts.  The "interval", "hearing" and

"hidden" limitations that Ruckus imports from its recasting of the preferred embodiment are not

required for basic practice of the invention and do not appear as limitations anywhere in claim 6.

7

5.     **"means to analyze . . . and enter . . ." (Independent Claim 6)**

NETGEAR construes this Section 112, ¶ 6 clause to have corresponding structure of a CPU programmed for performing the claimed function. (D.I. 112 at pp, 8-9, 6(d).) The '531 specification discloses that a CPU executes software routines for "analyzing" messages and "entering" addresses into a topology table. (*See, e.g.,* '531 at 12:25-43; Fig. 7 (CPU).) Along with the CPU, the specification discloses the CPU's relevant programming steps, disclosing that it updates the topology table by "add[ing] the address of each node overheard, and the address of nodes within each node's topology broadcast." ('531 at 12:63-65.) The Figure 9 flow chart shows steps 930 and 935 of listening for topology broadcast messages and updating the topology table to add addresses for each node from which a topology broadcast message was received, and the address of other wireless nodes within the topology broadcast. (*See also* '531 at 8:28-35, enters first tier addresses in topology table by adding entry to first tier, and replaces second tier address if updating second tier is needed).)[4] The '531 Patent thus discloses a corresponding CPU structure and its programming steps for this function as construed by NETGEAR. Ruckus argues the terms are indefinite and provides no construction.[5] (D.I. 112 at p. 8-9, 6(d).)

6.     **"means for analyzing . . . to determine . . ." (Independent Claim 6)**

This is a Section 112, ¶ 6 limitation. The '531 Patent specification discloses that a CPU in the internetworking nodes registers wireless nodes as claimed. (*See, e.g.,* '531 at 12:25-43

---

[4]   If the Court finds that this "means" clause does not involve a "specific function that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions", the CPU would suffice. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (general purpose processor sufficient for general purpose processor for functions of processing," "receiving" and "storing" of data).

[5]   After discovery closed, when preparing the Joint Statement, Ruckus continued to assert indefiniteness for corresponding structure for "means" terms but proposed "plain meaning" for functions. (D.I. 112.) The Court should reject these untimely plain meaning proposals.

(CPU implementing registration routine for registering wireless nodes); Fig. 7 (illustrating CPU accessing software routines).)  In addition to the disclosed CPU structure, the '531 Patent specification provides programming steps that the CPU implements for registration decisions. Specifically, it discloses a CPU executing instructions to determine if a sending wireless node is to be registered or not based on a network hierarchy (which may include use of a network address) and/or a transmission quality indicator.  (*See* '531 at 12:37-40 (CPU executes "registration routine 860 for determining whether the internetworking node should register an overheard wireless node *according to a hierarchy* (e.g., which AP has a lower address)"; 9:25-29 (registration routine "for example, one based on signal strength could be used").) Accordingly, the '531 clearly sets out a CPU programmed to perform the claimed function according to a network hierarchy or transmission performance metric as NETGEAR proposes. (D.I. 112 at p. 9, 6(e).) Ruckus again did not propose a construction (*see* footnote 4, *supra*) and instead asserts that the claim term is indefinite for lacking structure.  (D.I. 112 at p. 9, 6(e).)

### 7.    "means for marking registration status . . ." (Dependent Claim 7)

NETGEAR construes claim 7's "means for marking registration status" to have corresponding structure of a "CPU" performing the function of "marking registration status of wireless node in the indicia column." (D.I. 112 at pp. 9-10.)  The specification plainly shows a CPU for updating the topology table and shows a status indication such as a "yes" or "no" that the CPU may enter in an indicia column of a table if the node is to be registered.  ('531 at Fig. 7 (CPU); 12:26-43 (CPU); Fig. 5 (showing mark of "Yes" and "No" in "registered"/indicia column of exemplary topology table).)  The "marking" that indicates the status of a node can plainly be performed by a CPU as disclosed by the '531 patent, after steps have been performed for

determining whether to register the wireless node in claim 6.[6]  Ruckus yet again asserts a Section

112 indefiniteness position and offers no construction for the structure.  (D.I. 112 at p. 9-10.)

### 8.    "means for broadcasting . . ." (Dependent Claim 8)

NETGEAR construes "means for broadcasting" to have the corresponding structure of a

"wireless transmitter and equivalents thereof" performing the function of "broadcasting the

address of the internetworking node." (D.I. 112 at p. 10.) The specification explains that the

internetworking node communicates wirelessly to broadcast messages, including beacons, which

contain the address of the internetworking node.  ('531 at 7:65-67, internetworking node sends

beacons that contain address of the internetworking node.)  The specification further discloses

the structure of a wireless transmitter.  ('531 at Fig. 7, box 835 "wireless transmitter/receiver" in

an internetworking node); 12:18-25 (identifying the "wireless transmitter/receiver" component of

internetworking node).)  Ruckus once again fails to construe the term and instead proposes a

defective indefiniteness invalidity contention. (D.I. 112 at p. 10.)

### B.    The '480 Patent

The '480 Patent discloses a wireless LAN that uses antenna diversity techniques,

including polarization diversity and angular diversity, to enhance data throughput in the

unlicensed spectrum.  (*See, e.g.*, '480 at 2:39-42; 4:24-28.)  In radio communications, there is a

technique called "antenna diversity", an umbrella term for antenna systems having multiple

antenna configurations (rather than a single omni-antenna configuration).  When a transmitting

antenna propagates RF waves to a receiving antenna, things in the environment such as buildings

or trees may cause signals to fade and suffer multipath distortions, which detract their reception.

---

[6]    These basic steps of marking status in the column of a table appear to be functions a general
purpose processor could supply, and thus a CPU itself could be sufficient. *See In re Katz
Interactive Call Processing Patent Litig.*, 639 F.3d at 1316 (Fed. Cir. 2011).

Diversity antennas send radio waves using multiple configurations (such as having multiple antennas spaced apart, called spatial diversity, or using antennas radiating energy with different directional characteristics or patterns, called angular diversity, or using antennas whose waves propagate in different orientations, called polarization diversity). The '480 patent uses antenna transmission diversity in a novel way to optimize its performance in an unlicensed wireless LAN. Devices subscribed to (associated with) a wireless LAN transmit data over frequencies using polarization and angular diversity for antenna beams. The data transmissions are monitored for optimal conditions using performance metrics such as bit error rates or signal strengths. (*See, e.g.*, '480 at 6:17-26; 6:41-57.) In response, antenna beams having optimal polarization and angle/directional patterns are selected. (*See, e.g.*, '480 at 6:37-57.) Monitored data transmission frequencies can also be changed for optimal transmission conditions.

### 1.    "optimal conditions" (Independent Claims 1 and 12)

Claims 1 and 12 refer to monitoring for "optimal conditions" for RF data transmissions using antenna diversity over wireless transmission frequencies. NETGEAR construes "optimal conditions" as the "most desirable conditions available for a subscriber station transmitter to transmit data wirelessly." (D.I. 112 at p. 1.) The construction for claim 12 is similar. (D.I. 112 at p. 3.) Optimal conditions are those transmission conditions that support higher data throughput (amount of data transmitted without uncorrectable errors in a given time) in a wireless system. (*See, e.g.*, '480 at 4:66-67 (explaining how inclusion of polarization diversity "allows the ***through-put of the system to be maintained at a higher level*** than would be possible with just a single input experiencing fades".) The '480 explains how "optimal" conditions for data transmissions "may change over time" and therefore discloses monitoring how wireless transmissions utilizing antenna beams having diverse polarizations and angular directions, and

11

RF frequencies, are performing.  ('480 at 6:52-53 (monitoring optimal frequency and polarization for subscriber data transmissions); 5:31-36 (monitoring optimal conditions for data transmissions on diverse polarizations); 6:65-7:4 (monitoring BER and changing to "different beam and/or polarity").)  To determine the most desirable wireless transmissions conditions, the invention discloses, for example, monitoring bit error rate (BER) or RSSI of data transmissions having a plurality of possible polarizations, antenna angles/patterns and transmission frequencies.  ('480 at 6:43-46 ("the *optimal subscriber transmission frequency and polarization* may be determined by detecting a BER of subscriber transmissions to the hub or a similar quality measure"); 6:46-49 ("Also, signal levels or other quantitative measurements at the hub on the different polarizations and/or frequencies may be used to determine *an optimal subscriber transmission frequency and polarity*"); 6:65-7:4 (monitoring BER and changing to "a different beam and/or polarity").)  Accordingly, the '480 shows that "monitoring" for "optimal conditions for said RF data transmissions" refers to monitoring for the most desirable conditions available for wireless data transmissions, and the claims expressly tie those conditions to antenna beam polarizations used for data transmissions (and, in claim 12, also to angular directional/pattern of beams.)  Similarly, dependent claims include selection of a channel such as a frequency.

Ruckus again proposes no construction and instead argues the terms are indefinite.  (D.I. 112 at pp. 1 & 9-10.)  But, Ruckus must prove by clear and convincing evidence that the claims are "'not amenable to construction' or 'insolubly ambiguous'."  (*Trading Tech. Intern., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1358 (Fed. Cir. 2010) (citations omitted).)  Ruckus cannot prove that here.  "Optimal" is a plain English word readily understandable by a lay person.  Further, the specification clearly shows monitoring transmission error rates, signal strength, and the like, for RF data transmissions that use a plurality of antenna beam polarizations or patterns/angles,

12

and/or frequencies, for determining the optimal transmissions conditions to use. Like the disclosure, the claims expressly connect monitored optimal conditions to selection of antenna beam polarizations, antenna patterns/angles and/or transmission frequencies. One of ordinary skill can understand the metes and bounds of the claims here. (Ex. A, Saunders Decl., ¶ 34.) Similar arguments about "optimum" being indefinite have been rejected before. *See Emcore Corp. v. Optium Corp.*, No. 6-1202, 2008 WL 3271553, *7 (W.D.Penn. Aug. 5, 2008) (finding as definite the claim term "optimum SBS suppression" and construing this term to mean "the most advantageous level of SBS suppression for the system").)

### 2.    Subscriber Station Transmitter (Independent Claim 1/Dependent 13)

"Subscriber station transmitter" in claims 1 and 13 refers to "one or more transmitters of a station that is capable of transmitting data wirelessly to another station in order to transmit data to a network." (D.I. 112 at p. 1.) The '480 patent uses "subscriber station transmitter" to refer to a station that wirelessly transmits data to and receives data from a network such as a LAN or WAN. The patent explains, for example, how "data traffic in a network, such as a LAN, WAN, Intranet or the Internet, tends to be asymmetrical. Generally, more data is transmitted to a subscriber than from a subscriber to the network backbone." ('480 at 2:23-25.) The subscriber station may use for example IEEE 802.11 compliant equipment. (*See* '480 at 1:48-50 ("The IEEE, a standards group, is defining a wireless LAN standard, referred to as IEEE 802.11a for operation in the U-NII band.").) The reference point for a subscriber station is a network -- "a subscriber ***to the network backbone***." ('480 at 2:23-25.) The wireless aspect is confirmed by the claim, which provides for "RF data transmissions from a subscriber station transmitter" and changing "a polarization of said transmissions" in a method "for providing antenna diversity for an RF data transmission system." Antennas are used for wireless (RF) data transmissions, thus

13

confirming a subscriber transmitter transmits wirelessly.

Ruckus defines "subscriber station transmitter" as "transmitter of a station that has undertaken a subscription." (D.I. 112 at p. 1.) The '480 Patent never refers to a station having "undertaken a subscription" and the word "subscription" never appears. Ruckus's construction is vague and does not provide any reference for a subscription. NETGEAR properly refers to a station that communicates with a network by sending data wirelessly to another device.

### 3.    "bit error rate" (Dependent Claims 3 and 15)

NETGEAR construes "bit error rate" in dependent claim 3 as "a measurement of the rate of errors in RF data transmissions from said subscriber transmitter." (D.I. 112 at p. 2.) Claim 15's "bit error rate" is similar but does not require a "subscriber station". (*Id.* at p. 3.) Both claims refer to a "rate" at which errors occur. Thus, the patent discloses error rates measured for RF data transmissions (*See, e.g.*, '480 at 2:51-53; 6:20-23; 6:43-46.) NETGEAR's construction is consistent with the ordinary meaning of "rate" and the disclosure. Ruckus originally proposed a defective construction, which did not provide for any "rate" of errors but instead recast the claim as referring to "the number of received bits" with errors. (D.I. 112 at p. 2-3.) As with the claims, the specification shows the system monitors a "rate" of errors, not a "number" of errors. ('480 at 2:51-53 ("the bit error *rate* of transmissions from a subscriber and/or signal levels of available frequencies and polarizations are monitored"); 6:20-23 ("a determination is made at box 302 of the strength and quality of signals received on each antenna using criteria such as bit error *rate* (BER)").) Apparently understanding its error, Ruckus on the eve of filing the Joint Statement, changed its construction to plain meaning. NETGEAR's timely proposed construction, however, reflects the plain and ordinary meaning and should be adopted.

### 4.    "angularly diverse" (Independent Claim 12)

NETGEAR construes "angularly diverse" as meaning "at least one antenna beam from

14

one pair has different directional characteristics than at least one antenna beam in another pair".

(D.I. 112 at p. 2, 12(b).)  This confirms there are multiple pairs of beams having orthogonal

polarizations that also are angularly diverse.  Claim 12 is specifically directed to benefits of

using both angular diversity and polarization diversity for wireless (RF) data transmissions.

('480 Patent at 8:23-27; 8:35-38.)  The claim provides for selecting at least one antenna beam

from a plurality of pairs of antenna beams that have orthogonal polarizations, where the pairs

also exhibit angularly diversity, meaning the beams have different directional characteristics.

(*Id.*)  As the patent explains, using angular diverse antenna beams also having orthogonal

polarizations helps deal with obstructions that impact wireless data transmissions, supporting

higher data throughput.  (*See, e.g.*, '480 at 3:4-11; 3:21-26 (using antenna beams with different

azimuths to increase successful reception); 4:40-46 (using angularly diverse antenna beams,

which are beams that "point[] in different directions"); Fig. 1 (showing angularly diverse antenna

beams in different directions); 6:6-7 (using antenna beams with different angles).)   Thus, the

patent disclose that "antenna beams [that] point in different directions, angularly diverse antenna

beams with different polarizations" oriented to provide orthogonal polarizations.

Ruckus originally provided ***no*** construction, arguing "angularly diverse" is indefinite.

(D.I. 112 at p. 2.) Then, the day before filing the Joint Statement, Ruckus proposed that the claim

is so definite that "plain meaning" applies and no construction is necessary.  This and other

disputed terms (such as "bit error rate" above) have a "plain meaning" to people of skill in the

art, but not to a jury of lay people and should be construed to provide the jury guidance.

NETGEAR's construction is the plain meaning and should be adopted.

    **5.**    **"means for monitoring RF data transmission frequencies" (Claim 12)**

This is a Section 112, ¶ 6 limitation where the '480 specification provides corresponding

structure of "one or more wireless transceivers and equivalents thereof" for the function of monitoring the data transmission frequencies. (D.I. 112 at p. 2-3, 12(e).) The specification illustrates monitoring steps and provides references to Figures that show "transceivers" for monitoring. ('480 at Fig. 4 ("transceiver A" and "transceiver X" used to monitor bit error rates and/or signal levels on available frequencies and/ or polarizations); 6:33-57 (transceivers for monitoring polarizations, beams and frequencies by monitoring error rates, signal levels, or using other quantitative measurements.) Because monitoring is for RF data transmissions using antennas, the transceivers are for wireless transmissions. ('480 at Fig. 4 ("monitor BER of RF data transmissions"); *see also* Fig. 1 (showing in box 117 a wireless transceiver for wireless communication).) It is well known in the field, as a Ruckus technical expert admits, that a wireless transceiver may include components for monitoring RF signals. (Ex. B, Stutzman Dep. Tr. at 318:17-319:20; *see also*, Ex. C, *Loke*, "FIG. 1 is a block diagram of an RF transceiver", showing numerous components including those used for monitoring.) Ruckus once again says the claim is indefinite and offers no competing construction. (D.I. 112 at p. 2-3.)

### 6. **"means, responsive to said conditions, for selecting . . ." (Claim 12)**

This is a Section 112, ¶ 6 limitation where the specification provides corresponding structure of "one or more switches and equivalents thereof" for the function of selecting at least one antenna transmission beam as claimed. Figures 1 and 2 illustrate the switches and their connections to numerous antenna beams for selection. ('480 at Figs. 1-2.) The specification also details that switches perform the function of selecting beams for transmission. ('480 at 4:38-40 ("A polarization diverse antenna beam pair, for example 10H and 10V, may be fed into RX1 and RX2 through *switches* 114H and 114V."); 6:1-4 ("Subscriber system 200 has increased flexibility due to an ability to connect any set of antennas to a receive path via twelve-way

16

*switches* 23 and 24."); 5:29-36 ("***Switch*** 116 directs a transmitted signal").)  It is apparent that in response to the monitoring steps, the switches are used for selecting the proper beam pattern. Accordingly, the '480 patent specification discloses corresponding structure of one or more switches for the function of selecting beams for transmission, as provided by NETGEAR's construction.  Ruckus again provides no construction and asserts that the term is indefinite.

### C.      The '143 Patent

The '143 Patent discloses a novel automatic gain control ("AGC") circuit for a wireless receiver that operates in the unlicensed RF spectrum.  A gain control circuit adjusts gain levels of a receiver to ensure that incoming signals do not overload the receiver and prevent delivery of a usable data stream.  (*See, e.g.,* '143 at 1:15-23.)  The '143 Patent improves prior art gain control circuits by including a processor and statistics gathering engine to gather statistical information about RF interference (specifically information about its periodicity and duration), and uses the gathered statistics to direct at least in part the gain of the wireless receiver to mitigate effects of interference. (*See, e.g.,* '143 at 3:10-19; 5:1-18.)  Actions such as raising, lowering or holding receiver gain levels, can be statistically directed to mitigate effects of RF interference.

### 7.      "gain control circuit" (Independent Claim 13)

NETGEAR construes "gain control circuit" to mean "circuit that controls the gain of an apparatus that receives wireless data transmissions."  (D.I. 112 at p. 10.)  In the '143 Patent's claims and disclosure, the circuit controls the gain of a receiver that receives wireless data.  (*See, e.g.,* '143 at 1:15-18 ("Automatic Gain Control (AGC) is used in virtually all ***radio receivers***, and serves several functions."); 5:1-3 ("With attention directed to FIG. 2, present statistically directed AGC 200 is a preprocessor to demodulator 201 which is part of a ***radio receiver.***").) The '143 Patent is clear that its radio receiver that may be subject to RF interference is for RF or wireless data transmission, contrasting RF transmissions from wired transmissions.  (*See, e.g.,*

'143 at 1:40-41 ("Several such systems use RF transmission to *replace* copper wire or coaxial cable.").) RF data transmission in the '143 Patent includes transmission in the unlicensed wireless bands, which are unregulated radio frequencies used for wireless data transmissions. ('143 at 1:15-3:30 ("In 1997 the FCC created a wireless arena called Unlicensed National Information Infrastructure (U-NII). System operators are free to operate wireless equipment in three sub-bands . . . ."); 4:24-27 ("The present invention is used to detect interference and mitigate its effects on data transmission in unlicensed RF bands employing a method and system for a statistically directed automatic gain control 100 (AGC).").) Thus, claim 13 refers to "*RF interference*" and its impact on "receiver gain." NETGEAR's construction provides the proper construction for the "gain control circuit", consistent with the claims and disclosure.

Ruckus construes the language "operating a gain control circuit" to mean the "act of operating a gain control circuit." (D.I. 112 at p. 10, 13(a).) This "construction" does nothing to clarify the term. There is no dispute over the word "operating" and Ruckus merely repeats the term gain control circuit with construction. NETGEAR's construction should be adopted.

### 8.    "receiver gain"

NETGEAR construes "receiver gain" to mean "gain of an apparatus that receives wireless data signals." As discussed above, the '143 Patent describes and claims a wireless receiver. The patent expressly contrasts RF communications with wired communications, ('143 at 1:40-41 ("Several such systems use RF transmission to *replace* copper wire or coaxial cable."); 1:15-3:30 (invention in the context of "a wireless arena called Unlicensed National Information Infrastructure (U-NII)"; 4:24-27), and claim 13 regards using a statistically directed gain control circuit to help a receiver mitigate the effects of "RF interference." Ruckus's proposed construction -- "gain at a receiver" -- provides the jury no assistance in understanding

18

this invention because it fails to include the RF or wireless nature of the receiver whose gain is adjusted. The '143 Patent is directed to a wireless receiver and that is why the receiver gain is directed in part by statistically gathered information to mitigate issues of "***RF interference***".

   **9.**  **"periodicity"**

  NETGEAR construes "periodicity" to mean "repetitive nature or characteristic." (D.I. 112 at p. 10.) This is the plain meaning of periodicity, and the '143 Patent focuses on periodic interference which it refers to in the context of repetitive situations for which statistics can be gathered. (*See, e.g.*, '143 at 5:10-15 ("The AGC circuit constantly monitors the statistics of the incoming signal 206 and looks for repeatable situations."); 5:36-42 ("The statistics gathering engine looks for repetition in the interference at box 302. In other words, the statistics gathering engine seeks predictable factors in the signal such as an event that happens frequently such as every millisecond or a signal occupying a certain band of frequencies once in a while"); 5:50-51, "repetitive interference", "repetitive event") NETGEAR's construction captures periodicity as used in the '143 Patent. Ruckus's construction -- "having the characteristic of occurring at an interval" -- vaguely refers to "an interval". (D.I. 112 at p. 10.) Although periodic events repeat over various intervals not all events that occur at an interval are "periodic." NETGEAR's construction accurately captures this aspect of the invention, Ruckus' does not.

  **D.**  **The '454 Patent**

  The '454 Patent is for a system that uses adaptive antenna beam patterns to mitigate effects of interference in wireless LANs that use the unlicensed RF spectrum. Because the FCC does not regulate use of unlicensed RF spectrum, wireless LANs using that spectrum can be disrupted by sources that periodically interfere with wireless transmissions. The '454 patent uses smart antenna techniques to generate antenna patterns with nulls (suppressed gain) in the directions of RF interference to mitigate the effects of interference caused by periodic sources

common in unlicensed bands. (*See, e.g.*, '454 at 4:12-21.) The system ascertains a type of interference, which includes determining if it is from a periodic source, and locates the direction of interference. (*See, e.g.*, '454 at 4:60-63; 7:16-19.) Antenna patterns are generated with nulls in the direction of interference. (*See, e.g.*, '454 at 6:16-18.) Additional techniques such as changing transmission frequency may be used as well. (*See, e.g.*, '454 at 6:31-35.)

### 10.  "fixed relationship" (Independent Claim 1)

This preamble language is not limiting. *See Symantec Corp. v. Computer Assocs. Int'l, Inc.* 522 F.3d 1279, 1288 (Fed. Cir. 2008) ("Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble 'generally is not limiting'") (citations omitted).) This term was not used to distinguish prior art, does not provide any antecedent basis, and does not recite an essential step for asserted method Claim 1. (*See id.* at 1289-90 (preamble provides context and is not limiting because all steps of the claim are provided in the body). To the extent the Court chooses to construe this term, NETGEAR proposes it means a "transmitter and receiver are stationary relative to each other during a wireless data transmission". NETGEAR's construction confirms that the claim is to wireless data transmissions, and is consistent with the specification. ('454 at 2:4-14 (claimed invention is in the context of wireless LANs operating in the unlicensed bands); Claim 1 ("RF band data transmission system").) To the extent "fixed" is treated as a limitation, it is with respect to data transmissions; it does not fixate movable devices forever.

### 11.  "ascertaining a type of said interference"

NETGEAR construes "ascertaining a type of said interference" as "ascertaining a group, kind, or class of the interference". (D.I. 112 at p. 4, 1(d).) Ruckus construes the term to mean "ascertaining the category or characteristic of the interference". (*Id.*) The parties' constructions are very similar now that Ruckus has changed its construction on the eve of the parties' Joint

Statement.  NETGEAR's construction, however, uses the plain meaning of "type."

**12.   "interference is periodic" / "any periodicity of said interference"**

NETGEAR construes "interference is periodic" in claim 1 to mean "having a

characteristic of interference from a periodic source".  NETGEAR construes claim 14 similarly.

The specification discloses that periodic interference is a particular concern for unlicensed RF.

(*See, e.g.*, '454 at 3:11-14; 3:63-4:3.)  The invention thus provides for determining if interference

from a periodic source is present and reacts appropriately.  ('454 at 2:65-3:1 ("Interference is

generated within the system, *as well as coming from outside sources*"); 3:48-49 ("*interference*

*from foreign, outside sources*"); 6:48-55 ("Instead of ceasing communications with all users

*during the period that interfering source 20 is present*, radiation pattern 20B can be

generated."); 6:56 ("*periodic source 20*"); 7:4-6 ("For example, *interfering source 301*,

generating interfering signal 302 is found on beam 30D.").)  NETGEAR's construction aligns

with the '454 Patent.

Ruckus again improperly conflates the concept of periodicity of interference events with

any event that occurs at some unspecified interval.  The Court should adopt NETGEAR's

construction, which captures the plain meaning and aligns with the '454 patent's specification.

**13.   "generating a data transmission pattern with a null in the direction of said interference" / "a data transmission antenna pattern with a null in the direction of said interference" (Claims 1/14)**

NETGEAR construes this limitation to mean "an antenna pattern for data with suppressed

gain in the direction of said interference".  (D.I. 112 at p. 5-6.)  Ruckus's construction, on the

other hand, requires a "pattern that has a zero characteristic."  Ruckus's proposal that a null must

have a "zero characteristic" is not consistent with the intrinsic evidence or how one of skill in the

art understands the term.  First, nowhere does the '454 patent describe an antenna pattern having

a "zero" characteristic or how a "zero" characteristic could be used to suppress interference.  The

specification explains that its inventive antenna system helps with "reduction" of interference. Further, the IEEE Standard Definitions of Terms for Antennas, IEEE Std. at 145-1993, Ex. D, explains that a "directional null" is "a sharp *minimum* in a radiation pattern that has been produced for the purpose of direction-finding or the suppression of unwanted radiation in a specified direction". Ruckus's own chief technical officer, who works with antennas, testified that an antenna pattern with a null is understood as an antenna pattern with suppressed gain; he said nothing about any "zero" characteristic. (*See* Ex. E, Kish Dep. Tr. at 84:22-25; 89:12-21.) Ruckus's own retained expert testified that a "null" includes a *low* in an antenna pattern even when he tried to support the "zero" construction of his employer. (*See* Ex. B, Stutzman Dep. Tr. at 39:3-7.) Further, numerous other technical references confirm NETGEAR's construction that a "null" provides suppressed gain (not a "zero characteristic") in an antenna pattern. (*See, e.g.,* Fujimoto, "Mobile Antenna Systems Handbook", 2nd edition, Artech House, 2001, p. 272, Ex. F ("This suggests that to improve user capacity, gain suppression (null) in the interfering wave direction is more important than increasing the gain in the desired wave direction"); Fujimoto at p. 303 ("Deep nulls (20 to 30 dB) below the peak gain value are found . . . ."). "Generating a data transmission pattern with a null in the direction of said interference" in the '454 plainly refers to suppressed gain in an antenna's directional pattern for interference suppression. A "null" does not mean a "zero characteristic" to one of skill in the art. (Saunders Decl., ¶ 46.)

Ruckus again seeks to limit claims in a way lacking support. Nowhere does the '454 patent describe an antenna pattern having a "zero" characteristic or how a "zero" characteristic could be used to suppress interference. The specification explains that the inventive antenna system helps with "reduction" of interference. The patent as well as technical literature and testimony of Ruckus's own people unanimously support NETGEAR's construction.

22

### 14.   "narrow antenna beams"

NETGEAR construes "narrow antenna beams" to mean "antenna beams focused in directions for communicating with particular receiving devices." This is consistent with the specification and U.S. Patent No. 5,563,610 (Ex. G, "the '610 Patent"), which is incorporated by reference and therefore part of the intrinsic record. ('454 at 3:23-27.) The incorporated '610 Patent explains how employing narrow antenna beams can have benefits distinct from using single wide beams. ('610 at 6:29-31 ("[b]y employing narrow multiple beams instead of the wide single beams used in present systems, substantial performance improvement is achieved.").) This is because narrow antenna beams are focused in directions for communicating with particular devices. ('610 at 6:30-35 ("[S]ince narrow beams are more highly directional, focus on the signal from a desired mobile in a wireless communications system can be made to the exclusion of signals from other mobiles"); *see* '454 at 4:16-21 (discussing use of "multiple narrow beams covering a sector").) NETGEAR captures the meaning of "narrow antenna beams" as beams having directional characteristics, and thus higher gain, in directions for particular receiving devices. Ruckus again offers no construction and says this term is indefinite.

### 15.   "scanner"

NETGEAR construes "scanner" to mean a "RF receiver capable of being used to determine a frequency, bandwidth, and any periodicity of said interference in RF frequencies of interest." (D.I. 112 at p. 5, 14(c).) This comes right from the patent's disclosure of the scanner as a RF receiver. ('454 at Abstract ("a scanner determines the frequency, bandwidth and any periodicity of the interference"); Fig. 3 ("scanning receiver"); 7:8-10.) The "scanning receiver" scans "the frequencies in the band of interest" for interference. ('454 at 7:8-10.) The scanner collects RF energy collected from directional antenna beams to identify sources of interference. ('454 at 7:1-19.) The system uses information from its scanner to adapt antenna patterns to

23

address interference it locates.  ('454 at 7:16-19.)  Scanning receivers are structures with many

examples in the art as Ruckus's expert admits. (*See* Ex. B, Stutzman Dep. Tr. at 320:12-25.)

Ruckus again refuses to construe a term it identified for construction, oddly asserting that

this term, which does ***not*** use the term "means", really is a means-plus-function term and then

argues it is invalid for allegedly having no corresponding structure.  But, this element does not

use any "means" language and therefore section 112(6) is presumed to not apply.  (*See, e.g.*,

*Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011)

("[T]he presumption flowing from the absence of the term 'means' is a strong one that is not

readily overcome.").)  A "scanner" itself is a structure.  Further, the specification discloses as an

example an RF receiver that scans frequencies of interest. Ruckus's arguments are incorrect.

### E.    The '035 Patent

The '035 Patent discloses a data transmission system where devices on both ends of a

link use antenna diversity for data transmissions to address issues like multipath fading.  ('035 at

Abstract; 2:1-6.)  Each end of a link uses one or more of several disclosed metrics to determine

and store information about which of its antennas sent or received data most successfully and in

turn uses that antenna as its preferred antenna for subsequent data transmissions to the other end

of the link.  (*See, e.g.*, '035 at 3:61-4:3; 4:23-25; 4:33-45; 4:66-5:9; 5:10-18; 5:24-30; 6:66-7:33.)

Further, the '035 Patent discloses that its system permits changes to antennas used to retransmit

data to the other link following unsuccessful data transmissions, further enhancing performance.

(*See, e.g.*, '035 at 7:9-14; 8:7-11.)  For this patent, Ruckus contends that virtually every single

claim limitation is indefinite and failed to provide any constructions for those terms.

### 16.    "base station" (Claim 1)

NETGEAR construes "base station" to mean "station having a wired connection to a data

network that may be used by at least one mobile station to communicate with a wired network."

24

(D.I. 112 at p. 11, 1(a).)  As explained by the Abstract, "a base station is wired to a Local Area Network (LAN), and has wireless communications with a plurality of mobile stations."  (*See Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 & n.* (Fed. Cir. 2000) (holding that "Abstract" is relevant intrinsic evidence).  Similarly, as shown in the specification, a base station is a root node that connects to both a wired and wireless network to allow its associated wireless stations to communicate with a wired network.  ('035 at 6:10-17.)

Ruckus construes "base station" as "a section of a cellular telephone network that is responsible for handling traffic and signaling between a mobile phone and a network switching subsystem."  But the claimed invention is nowhere limited to cellular telephone systems.  The claims do not limit their usage to cellular networks let alone telephone networks, and instead provide for "a diversity transmission system for wireless radio communications between a base station and a mobile station".  ('035 at Claim 1.)  The specification confirms that "this invention relates *generally* to data communications via radio . . . [where] a combination of antenna diversity techniques utilized at both a base station and a mobile station" improve data transmissions.  ('035 at 1:6-12.)  Indeed, the exemplary embodiment is not a cellular telephone network but instead is an indoor radio LAN with quasi-static and reciprocal properties.  ('035 at 2:45.)  Because the invention is directed to a novel antenna diversity technique, it can improve data transmissions in wireless LANs generally; there is no reason to limit it to cell phones.

### 17.     "mobile station" (Claim 1)

NETGEAR construes "mobile station" as a "station that is capable of being moved that may communicate wirelessly with a base station to communicate with a wired data network."  (D.I. 112 at p. 11, 1(a).)  As explained above for "base station", a "mobile station" is a device that communicates wirelessly with a base station to access a wired network.  ('035 at 6:10-17.)

25

The word "mobile" is used to distinguish a wireless station capable of being moved from a base station that serves as the root to a wired LAN. Ruckus construes "mobile station" to mean "a mobile device in a cellular telephone network." (D.I. 112 at p. 11, 1(a).) Ruckus again improperly seeks to limit the claim to cellular telephones. Nothing in the claim or disclosure restricts the '035 to cell phone networks. The specification confirms that its antenna diversity techniques apply to wireless data networks generally including "quasi-static" mobile/indoor radio propagation channels. (See, e.g., '035 at 1:6-12; 2:41-45.)

>    18.    **means in the base station for determining which one of said multiple antennas received data most successfully . . . (Claim 1, abbreviated)**

This section 112, ¶ 6 clause (abbreviated to save space) has corresponding structure of a controller that considers signal energy, error checking, and/or receipt of acknowledgement packets for determining which antenna received data most successfully (referred to as the "preferred antenna" then used by the base station for transmissions to the mobile station). The "controller" collects information about the success or failure of receptions and in turn determines its preferred antenna for transmitting data according to three mechanisms. (See, e.g., '035 at 5:34-45 (antenna selection "under the control of a controller"); 6:18-26 (controller selections using lines 20 and 21); Figs. 2-3 (showing the base station "controller" for implementing software algorithm).) First, the base station controller can determine which antenna received data most successfully based on which antenna received the "data packet with higher received signal energy". ('035 at 3:61-4:2.) Second, the base station controller can determine which antenna received a data packet most successfully in light of the "success or failure of the computation of an error-detecting code or checksum." ('035 at 5:24-29.) Thirdly, the controller can consider whether "one antenna received the acknowledgement more successfully", and change the preferred antenna accordingly. ('035 at 4:12-21.) Thus, the corresponding structure

26

is a controller operative to use signal strength, error checking, and/or reception of acknowledgements for the claimed function of determining the preferred antenna. Ruckus has no construction and says the term is indefinite for having no corresponding structure.

As for the claimed function, Ruckus changed its original construction and now proposes that the function is definite and has its ordinary meaning. (D.I. 112 at p. 12, 1(c).) Yet, Ruckus apparently also says that same function's terms of "received data most successfully" are indefinite. The Court should reject Ruckus's conflicting positions. NETGEAR's proposed construction follows the plain language and is consistent with the proper corresponding structure.

**19.    means in said at least one mobile station for selecting one of said multiple antennas in such mobile station as a preferred antenna. . .**

Consistent with "means in the base station for determining", this section 112, ¶ 6 clause (abbreviated to save space) for the mobile station also has corresponding structure of a controller that selects a preferred antenna based on signal energy, error checking, and/or receipt of acknowledgements. ('035 at 4:64-5:9 (higher received signal energy); 5:24-29 (use of error detecting code); 5:12-23 (receipt of acknowledgements); Figs. 1, 5; 5:34-43 (controller at mobile station selecting antennas); *see also* 4:62:64; 8:25-38 (mobile station and base station function similarly).) Ruckus has no construction and says the term is indefinite for lacking a corresponding structure. Ruckus is not correct as shown above. As for the claimed function, NETGEAR's construction follows the plain meaning and is consistent with the corresponding structure. The Court should reject Ruckus's conflicting constructions, which both acknowledge that the function is definite for a plain meaning, but then argues the words "successfully receive data" in the exact same clause are indefinite. (D.I. 112 at p. 12, 1(d).)

**20.    a preferred antenna storage means in the base station and in at least one mobile station in which is stored indicia indicative of which antenna at such station is determined to be the preferred antenna**

27

NETGEAR construes claim 1's "preferred antenna storage means . . . ." to have corresponding structure of a "table or register and equivalents thereof" for "storing indicia indicative of which antenna at such station is determined to be the preferred antenna." (D.I. 112 at p. 13, 1(e).)  The specification explains that "a mobile station storage means such as a register ***or table*** 58 contain[s] the number of the currently preferred mobile station antenna." ('035 at 7:39-41; *see also* 8:7-11 ("the contents of the preferred mobile station antenna register ***or table*** 58 are changed to select the other antenna at block 69, and a return is made to block 64, and transmission is attempted again.", Fig. 4 ("in preferred antenna table"; col. 8:43-46, base station "preferred antenna table 30.")  Ruckus originally construed this term to be "limited to a register that stores information as to a preferred antenna.")  Ruckus then withdrew its construction (which had inexplicably omitted the disclosed antenna ranking table) on the eve of the Joint Statement, saying it would agree to plain meaning for the function but failing to identify structure. (D.I. 112, at p. 13, 1(e).)  Means plus function terms do not have plain meanings other than corresponding structures.  The Court should adopt NETGEAR's construction.

21.  **controller at said base station and said at least one mobile station . . .**

NETGEAR construes the "controller" limitation (abbreviated above for convenience) as a "device used to control antenna selection".  The claim language itself provides that the controller selects "the preferred antenna". ('035 at Claim 1.)  The specification also discloses that antenna selection is made under the controller. ('035 at 5:41-45, "The controller switches between a plurality of antennae 1, 2 by the controlling the antenna switch 3."); 7:34-37, "In FIG. 5 is shown a mobile station controller 5 with signals on lines 55 and 56 which control which mobile station antenna 1 or 2, respectively, is selected for transmission and reception."); 8:12-18, controller selecting antenna for retransmissions).)  Ruckus fails to provide any proposed construction for

28

"controller". Instead, it incorrectly contends this term is a means-plus-function element and then contends it lacks corresponding structure. But, this term does not use "means" language, and as such section 112(6) presumably does not apply. (*See, e.g.*, *Inventio AG*, 649 F.3d at 1356 ("[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.").) A "controller" is structure, and the specification shows it as structure. (*See, e.g.*, '035 at 5:35-6:7; 6:18-26 ("base station controller 16 which provides signals on lines 20 and 21 for selecting which base station transceiver" to transmit); 6:32-37 ("base station controller 16 receives signals on either line 22 or line 23 or both" and "may activate either line"); Figs. 1-5 (showing controller as structure).) This is not a means clause; controller is structural.

### 22.     "means for changing the preferred base station antenna . . ."

This is a Section 112, ¶6 limitation having corresponding structure of a "base station antenna switch" for "changing the preferred base station antenna for retries." The base station uses an antenna switch to change from one antenna to another for transmissions as appropriate. (*See, e.g.*, '035 at 5:41-48 (using the "antenna switch 3" and switch setting to change the transmitting antenna for packet transmissions).) The "antenna switch" may change the antennas used for retransmissions where the station's data transmissions have not been successfully acknowledged. ('035 at 4:18-21 ("If the acknowledgement from the mobile station is not received, the base station retries the data packet on the other antenna, which now becomes the preferred antenna.").) Ruckus originally did not propose a construction and instead incorrectly asserted that the term lacks corresponding structure and is indefinite. Ruckus then withdrew its defective contention in the Joint Statement, proposing plain meaning. That is inadequate for this Section 112, ¶6 clause. The Court should adopt NETGEAR's timely proposed construction.

### 23.     ". . . means for measuring received signal strength . . ." (Dep. Claim 4)

This Section 112, ¶6 claim instructs that the structures in the base station and mobile

station used to determine their respective preferred antenna is "means for measuring received signal strength", which corresponds to the specification's structure of a "RF transceiver and equivalents thereof". (D.I. 112 at p. 14.) The specification discloses a transceiver for measuring the received signal strength of a data packet. ('035 at 2:20-23 ("Received signal strength is measured at each antenna/transceiver branch and the information is used in the selection of the 'preferred antenna'."); 1:30-34 ("transceiver" measures received signal strength for antenna branches); Figs. 1 & 2 (illustrating "transceiver structure" for antenna branch).) The specification provides the structure (transceiver and equivalents) for the function (measuring signal strength), and explains its purpose (use for determining a preferred antenna in light of measurement). Ruckus first said this term was indefinite. It then said the function has a plain meaning. In any event, the Court should adopt NETGEAR's proposed construction.

24.    **"includes error correction means to make a determination" (Claim 5)**

NETGEAR construes this limitation as a Section 112, ¶6 limitation that refers to the "inclusion of error checking or detecting in the means for determining which of said multiple antennas in said base station received signals most successfully." (D.I. 112 at p. 14.) The '035 specification discloses as corresponding structure for this "means" clause that "the success or failure of the computation of an error-detecting code, or checksum" should be employed for "determining packet reception success". ('035 at 5:24-30.) These are routine components of error correction schemes for detecting errors in packet transmissions for correction. (Ex. H, Sabharwal Dep. Tr. at 243:13-244:17; Ex. B Stutzman Dep. Tr. at 232:5-234:17.) NETGEAR supports its proposed construction directly with the disclosure clearly linked to the claimed function of determining which of the multiple base station antennas received data most successfully. Ruckus says that the term is indefinite and that there is no corresponding structure.

30

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL

Eric R. Lamison
Ryan J. Casamiquela
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Steven C. Cherny
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

March 26, 2013

7084171

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff NETGEAR, Inc.*

31

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 26, 2013, upon the following in the manner indicated:

| | |
|---|---|
| George Pazuniak, Esquire<br>PAZUNIAK LAW OFFICE<br>1201 Orange Street<br>7th Floor – Suite 7114<br>Wilmington, DE  19801 | *VIA ELECTRONIC MAIL* |
| Colby B. Springer, Esquire<br>LEWIS AND ROCA LLP<br>2240 West El Camino Real, 6th Floor<br>Mountain View, CA  94040-1499 | *VIA ELECTRONIC MAIL* |
| W. Brent Rasmussen, Esquire<br>Nathaniel W. Edwards, Esquire<br>Shane E. Olafson, Esquire<br>LEWIS AND ROCA, LLP<br>40 North Central Avenue<br>Phoenix, AZ  8/5004 | *VIA ELECTRONIC MAIL* |

Jack B. Blumenfeld (#1014)

1