## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **NETGEAR INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **C.A. No. 1:10-cv-00999-SLR** |
| | ) | |
| **RUCKUS WIRELESS INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## RUCKUS WIRELESS, INC.'S RESPONSE TO
## NETGEAR'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Colby B. Springer (pro hac vice)
CSpringer@LRLaw.com
LEWIS AND ROCA LLP
2440 West El Camino Real, Sixth Floor
Mountain View, CA 94040

Shane E. Olafson (pro hac vice)
SOlafson@LRLaw.com
W. Brent Rasmussen (pro hac vice)
BRasmussen@LRLaw.com
LEWIS AND ROCA LLP
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004

April 8, 2013

George Pazuniak (DE #478)
PAZUNIAK LAW OFFICE LLC
1201 North Orange Street
7th floor, Suite 7114
Wilmington, DE 19801-1186
GP@del-iplaw.com

*Attorneys for Defendant Ruckus Wireless, Inc.*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  THE LAW OF CLAIM CONSTRUCTION ..................................................... 1

III. CLAIM TERMS ................................................................................................ 3

    A.   The '531 Patent ....................................................................................... 3

        1.   'internetworking node' (claim 6) ................................................. 3

        2.   'wireless nodes' (claim 6) ............................................................ 4

        3.   'first tier column' and 'second tier column' (claim 6) ........................... 5

        4.   'topology broadcast messages' (claim 6) .................................... 6

        5.   "means to analyze and enter" (claim 6) ...................................... 8

        6.   'means for analyzing to determine' (claim 6) ............................. 8

        7.   'means for marking registration status' (claim 7) ...................... 9

        8.   'means for broadcasting' (claim 8) ............................................. 10

    B.   The '480 Patent ..................................................................................... 11

        1.   'optimal conditions' (claims 1 and 12) ...................................... 11

        2.   'subscriber station transmitter' (claims 1 and 13) ...................... 12

        3.   'bit error rate' (claims 3 and 15) ................................................ 12

        4.   'angularly diverse' (claim 12) .................................................... 12

        5.   'means for monitoring' (claim 12) ............................................. 12

        6.   'means for selecting' (claim 12) ................................................. 13

    C.   The '143 Patent ..................................................................................... 13

        1.   'operating a gain control circuit' (claim 13) ............................... 14

        2.   'periodicity' (claim 13) .............................................................. 15

        3.   'receiver gain of said gain control circuit' (claim 13) ................. 16

    D.   The '454 Patent ..................................................................................... 16

1.      'fixed relationship' (claim 1) ................................................. 16

2.      'ascertaining a type of said interference' (claim 1) ............................ 17

3.      'interference is periodic' / 'any periodicity of said interference' (claims 1/14) ......................................................... 17

4.      'generating a data transmission pattern with a null in the direction of said interference' / 'a data transmission antenna pattern with a null in the direction of said interference' (claims 1/14) ....................... 18

5.      'narrow antenna beams' (claims 2/16) ................................... 19

6.      "multibeam antenna" (claim 14) ........................................ 20

7.      'at least one scanner determining, [sic] a frequency, bandwidth and any periodicity of said interference' (claim 14) ................................ 20

E.      The '035 Patent ............................................................ 21

1.      'base station' (claim 1) ................................................... 21

2.      'mobile station' (claim 1) ................................................ 22

3.      'means . . . for determining' (claim 1) ................................... 23

4.      'received data most successfully' (claim 1) ............................. 25

5.      'means for selecting' (claim 1) .......................................... 26

6.      'preferred antenna storage means' (claim 1) ......................... 28

7.      'controller . . . selecting the preferred antenna' (claim 1) .............. 28

8.      'means for changing' (claim 1) .......................................... 29

9.      'means for measuring' (claim 4) ........................................ 30

10.     'error correction means' (claim 5) ...................................... 30

IV.  CONCLUSION .................................................................. 30

## **TABLE OF AUTHORITIES**

### CASES

*Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ........................................ 22

*Advanced Display Sys's. Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000) .................... 22

*American Piledriving Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324 (Fed. Cir. 2011) ........... 16

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.* 314 F.3d 1313 (Fed. Circ. 2003) ....................... 2, 5

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324 (Fed. Cir. 2006) .......... 4

*Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) .................... 10

*August Tech. Corp. v. Camtek, Ltd.,* 655 F.3d 1278 (Fed. Cir. 2011) ......................................... 20

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F. 3d 1338 (Fed. Cir. 2008) ....................... 26

*Blackboard, Inc. v. Desire2Learn, Inc.*, 564 F.3d 1371 (Fed. Cir. 2009) .................................... 8

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ................... 17

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F. 3d 1342 (Fed. Cir. 2005) ........................ 2, 11

*Emcore Corp. v. Optium Corp.*, No. 6-1202, 2008 WL 3271553 (W.D. Penn. Aug. 5, 2008) .... 12

*Eplus, Inc. v. Lawson Software, Inc.*, 700 F. 3d 509 (Fed. Cir. 2012) ......................................... 29

*Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012) ......................... 10

*Function Media, LLC v. Google, Inc.*, 708 F.3d 1310 (Fed. Cir. 2013) ....................................... 2

*Halliburton Energy Services, Inc. v. M I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) ............ 2, 4, 20, 27

*In re Katz*, 639 F.3d at 1316 ................................................................................................... 10

*Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111 (Fed. Cir. 2004) ........................ 15

*Interdigital Communications v. Intern. Trade Com'n*, 690 F. 3d 1318 (Fed. Cir. 2012) ............. 30

*Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000) ....................................... 7

*Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2000) .......................... 7

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 ................................................................. 13

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F. 3d 1282 (Fed. Cir. 2005) ....................................... 2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 1, 17

*Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344 (Fed. Cir. 2012)................................ 5

*Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F. 3d 1193 (Fed. Cir. 2002).................. passim

## STATUTES

35 U.S.C. §112................................................................................................................. passim

35 U.S.C. §132.......................................................................................................................... 25

## I.      **INTRODUCTION**

Netgear alleges infringement of almost 30 claims from 5 separate patents: U.S. Patent

Nos. 5,812,531 ("the '531 patent"), 6,621,454 ("the '454 patent"), 7,263,143 ("the '143 patent"),

5,507,035 ("the '035 patent") and 6,512,480 ("the '480 patent") (collectively the "patents-in-

suit"). Ruckus agreed to adopt Netgear's constructions for some terms, to forego other disputed

terms, and to rely on the plain and ordinary meaning wherever possible.  Whereas the parties had

collectively initially identified <u>over 80 terms</u> for construction, the Court is now asked to construe

only 32 terms across five patents (*i.e.*, less than 7 terms per patent). Many terms are indefinite for

lack of discernible meaning under 35 U.S.C. §112 ¶2. Other terms (*i.e.*, means-plus-function) are

indefinite for lack of a disclosed structure as required by 35 U.S.C. §112 ¶6. These claims leave

the public – and jury – no way to determine the metes and bounds of the patents-in-suit.

## II.     **THE LAW OF CLAIM CONSTRUCTION**

The Federal Circuit has set forth several guideposts for claim construction. *Phillips v.*

*AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). First, "the claims of a patent define the

invention." *Id.* at 1312. Outside of the claims "[t]he best source for understanding a technical

term is the specification from which it arose, informed, as needed, by the prosecution history,"

which demonstrat[es] how the inventor understood the invention and whether the inventor

limited the invention . . . making the claim scope narrower than it would otherwise be." *Id.* at

1315-17. Extrinsic evidence, such as dictionaries, may illuminate the "underlying technology and

the way in which one of skill in the art might use the claim terms." *Id.* at 1318. Similarly, expert

testimony can "establish that a particular term . . . has a particular meaning [or lack thereof] in

the pertinent field." *Id.*

There are times when the evidence fails to provide any discernible meaning. *Datamize,*

*LLC v. Plumtree Software, Inc.*, 417 F. 3d 1342, 1347 (Fed. Cir. 2005) (claims "not amenable to construction" or "insolubly ambiguous" are indefinite under §112, ¶2). "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Services, Inc. v. M I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008). The Court need not construe indefinite claim terms. *Amgen, Inc. v. Hoechst Marion Roussel, Inc*. 314 F.3d 1313, 1342 (Fed. Circ. 2003).

"Means-plus-function" terms are governed by §112, ¶6, which dictates that "the specification must contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means limitation." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013). Further, "[s]tructure disclosed in the specification is `corresponding' structure <u>only if</u> the specification or prosecution history <u>clearly links or associates that structure to the function</u> recited in the claim." *Texas Digital Systems, Inc. v. Telegenix, Inc*., 308 F. 3d 1193, 1208 (Fed. Cir. 2002) (emphasis added). Where the purported structure is a computer, §112, ¶6 "require[s] the specification to disclose the algorithm for performing the function." *Function Media*, 708 F.3d at 1318. Cursory references to software "without providing some detail about the means to accomplish the function, is not enough." *Id.* (quotations omitted).

Where the preamble helps define the claimed invention, it must be considered a limitation. *NTP, Inc. v. Research in Motion, Ltd*., 418 F. 3d 1282, 1305-06 (Fed. Cir. 2005). Preambles limit a claim when it "recites essential structure or steps," "is necessary to give life, meaning, and vitality to the claims," "necessary to provide context for the claim," or "when the limitations in the body of the claim rely upon and derive antecedent basis from the preamble." *Id.*

III.   **CLAIM TERMS**

    A.   **The '531 Patent**

        1.   **'internetworking node' (claim 6)**

An 'internetworking node' is "a physical device that includes a wired and wireless network adapter for relaying or forwarding messages in a network." (D.I. 112 at 7.) The claim language implies that an 'internetworking node' must have a wireless network adapter to enable wireless communications. ('531 at 14:49-52 (reciting an 'internetworking node for use in a network including a plurality of wireless nodes including: means to send messages to the wireless nodes and to receive messages from the wireless nodes.")) The specification defines an 'internetworking node' as having "a wired network adapter as well as a wireless network adapter" to "perform the full range of internetworking services." ('531 at 2:27-32; *see also id.* at 2:23-26 (noting "[t]ypical internetworking services include relaying messages from one wireless node to another, resending messages from a wired LAN to a wireless node and resending messages from a wireless node to a wired LAN."; *id.* at 12:18-33 (describing a diagram of the components of an internetworking node to include "forwarding routine 845 for forwarding messages either onto the wired LAN, or to a wireless node by a wireless transmission."))

Netgear objects to the inclusion of the wired network adapter, purporting that preferred embodiments would be excluded. (D.I. 113 at 3-4.) Notwithstanding the fact that it is actually the wired embodiment described as "preferable," the single embodiment cited by Netgear refers to a particular use case where an AP provides some, but not the "full range of internetworking services," that can be provided by a true 'internetworking node.' ('531 at 2:27-32.) Moreover, the specification notes "two APs do not <u>need</u> to be connected by wire or form a wired LAN" and [i]n <u>this case</u> no wired network adapter would be <u>required</u>." ('531 at 11:46-61.) Contrary to

Netgear's contention, "[a]bsence of <u>need</u> for a component does not necessarily mean that component is absent"; Ruckus's construction does not, therefore, exclude the cited embodiment. *See Halliburton Energy Services*, 514 F.3d at 1251. Finally, during prosecution, the applicants asserted patentability over the prior art due to the "internetworking node having both means for communicating with wired nodes and means for communicating with mobile node disclosed in the claim." (D.I. 114 at A-639.) Ruckus's construction should therefore be adopted.

### 2.   **'wireless nodes' (claim 6)**

A 'wireless nodes' is "a wireless node in a wireless network and that is not an internetworking node." (D.I. 112 at 7.) Claim 6 recites 'internetworking node' and 'wireless nodes' separately, implying reference to distinct devices. The remaining intrinsic record further confirms that 'wireless nodes' refer to devices that are <u>not</u> 'internetworking nodes.' *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (holding "[t]he prosecution history, specification, comparison with other claims in the patent, and other evidence may require that two terms in a claim refer to different structures").

Claim 5, for example, recites components of a 'wireless node,' some of which overlap those of the 'internetworking node,' but specifically ***lacking*** a means for registering other nodes in the network. ('531 at 14:30-48; *id.* at 15:1-4.) The specification reiterates this distinction: "registration routine 860 for determining whether the <u>internetworking node</u> should register an overheard <u>wireless node</u>." ('531 at 12:37-40) (emphasis added.) Further distinguishing 'wireless node' from 'internetworking node,' the specification equates 'wireless nodes' with "mobile nodes." (*Id.* at 1:19-22; 2:33-37.)) During prosecution, the applicants distinguished "mobile nodes" from "internetworking nodes." (D.I. 114 at A-639 (stating "[a]pplicants' claims combine a mobile node, and internetworking node."))

Netgear incorrectly states that negative limitations are "disfavored as a matter of law." (D.I. 113 at 4.)  The Federal Circuit has, in fact, "endorsed this approach, recognizing that patentees can use <u>negative</u> limitations . . . to avoid rejection." *Amgen*, 314 F.3d at 1329 (emphasis in original); see also *Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012) (holding that "[n]egative limitations are adequately supported when the specification describes a reason to exclude the relevant limitation" and such reason "need not rise to the level of disclaimer.") As reasons of support abound in the intrinsic record, Ruckus's construction should be adopted.

### 3.    'first tier column' and 'second tier column' (claim 6)

Ruckus construes 'first tier column' as "a column in a topology table containing the addresses of wireless nodes that an access point can hear." (D.I. 112 at 7.) Claim 6 recites that the 'first tier column' stores "network addresses of wireless nodes transmitting topology broadcast messages received by said at least one internetworking node." ('531 at 14:53-62.)  The specification defines 'internetworking node' as an access point capable of providing a full range of internetworking services. The 'topology broadcast messages' are being received by access points. The specification, in its only reference to a 'topology table,' describes columns of two access points where "[t]he first tier [column] contains the addresses of wireless nodes that the AP can hear." (*Id*. at 7:43-61.) A topology broadcast message "received by" an access point is one that can be "hear[d]."  Netgear objects to Ruckus's construction as restrictive but fails to articulate what is excluded by the construction. (D.I. 113 at 6.) Netgear would be loath to explain how an 'internetworking node' could receive a topology broadcast message without hearing it.

A 'second tier column' is "a column in a topology table containing network nodes that first tier wireless nodes can hear, including the addresses which a first tier wireless node stores

within its node address list and broadcasts as its topology broadcast." (D.I. 112 at 7.) Claim 6 states the 'second tier column' stores "network addresses of other wireless nodes contained in said topology broadcast messages." ('531 at 14:57-62.) The '531 patent teaches "other wireless nodes" are those that "the first tier wireless nodes can hear" and "for each wireless node in the first tier, the second tier stores the addresses which the first tier wireless node stores within its node address list and broadcasts as its topology broadcast." (*Id.* at 7:53-58.)

Netgear's construction improperly imports the word "may" (*i.e.*, "storing network addresses . . . that <u>may</u> be contained in said topology broadcast messages). (D.I. 112 at 8) (emphasis added). Use of "may" implies that addresses of those other nodes—which later form the second tier column—may *or may not* be included in topology broadcast message. This is contrary to the specification that unequivocally teaches that the second tier column "contains those network nodes that the first tier wireless nodes can hear." ('531 at 7:53-55.) Dr. Mohapatra observed that the *only* description of a topology table requires the table's second-tier column to contain the address of every network node that a first-tier wireless node can hear. (Ex. A, Mohapatra Rpt. at ¶¶87-93.) Ruckus's construction is consistent with the intrinsic record.

### 4.   **'topology broadcast messages' (claim 6)**

Ruckus construes 'topology broadcast messages' as follows:

> a message broadcast from a wireless node that includes the network address of the wireless node and the address of other nodes that have been heard during an interval since a prior topology broadcast message, including the network addresses of nodes not hidden from a sending node during the interval since the last broadcast.

(D.I. 112 at 8.) Claim 6 states that 'topology broadcast messages' are 'transmitted' from wireless nodes, and that such messages contain the network address of the sending wireless node and "network addresses of other wireless nodes." ('531 at 14:53-67.)

Netgear objects to 'internal,' 'hearing,' and 'hidden' in Ruckus's construction as "ignor[ing] distinctions between claim 6 and . . . claim 14." (D.I. 113 at 7.) That one independent claim uses different words than another does not necessarily invoke the doctrine of claim differentiation. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (holding "[t]hat the patentee chose several words in drafting a particular limitation of one claim, but fewer (though similar) words in drafting the corresponding limitation in another, does not mandate different interpretations of the two limitations") (internal quotations and citations omitted); *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2000) (holding "[i]t is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved.")

Netgear even concedes claim 14's clarification that "topology broadcast messages" are broadcast periodically. (D.I. 113 at 7.) The notion of periodic topology broadcast messages is found in other claims. (*See e.g.*, '531 at 14:39-41 (reciting "means to cause said sending means <u>at the end of a period</u> to broadcast its own address and the list of network addresses" (emphasis added)); *see also* i*d.* at 13:60-63 (noting "broadcasting, by each wireless node, at the end of a period its own network address and a list of the network addresses of any other wireless nodes from which it has received a message within a period.")) Ruckus's construction is also grounded in the specification:

> Wireless nodes broadcast topology broadcast messages which includes both their own network addresses, and the address of other nodes, including APs, that they have <u>heard</u> during the <u>interval</u> since they last send a topology broadcast message (*i.e.*, the wireless network addresses of nodes <u>not hidden</u> from the sending node during the interval since the last broadcast.

(*Id.* at 4:5-11 (emphasis added); *see also id.* at 6:66-7:4; i*d.* at 7:20-23.) As with the terms 'first tier column' and 'second tier column,' Netgear fails to identify any embodiment excluded from

Ruckus's construction.  Ruckus's construction should therefore be adopted.

     5.    **"means to analyze and enter" (claim 6)**

Ruckus asserts that this means-plus-function term is indefinite for want of corresponding structure for performing the recited functions of analyzing topology broadcast messages and entering addresses of network nodes in a topology table. (D.I. 112 at 8.) The specification teaches that these functions are performed by software, but no algorithms or specific programming steps are disclosed for such software. ('531 at 12:35-37, noting "a topology table updating routine 855 for constructing the topology table 823 for overheard topology broadcasts".) Ruckus's technical expert agrees. (*See* Ex. A, Mohapatra Rpt. at ¶59.)

Netgear argues that programming steps are disclosed by Figure 9 and teachings on "adding the address of each node overheard, and the address of nodes within each node's topology broadcast." (D.I. 113 at 8.) But these purported programming steps do not disclose any 'analyze' function; further, they merely repeat language from the 'enter' function of the disputed limitation, describing a desired outcome but no means for achieving that outcome. See *Blackboard, Inc. v. Desire2Learn, Inc.*, 564 F.3d 1371, 1384 (Fed. Cir. 2009) (finding claim indefinite where the specification simply described a function without explaining how it was to be performed.) 'Means to analyze and enter' is indefinite.

     6.    **'means for analyzing to determine' (claim 6)**

This term is indefinite for lacking corresponding structure under §112, ¶6. Claim 6 recites 'means for analyzing the topology table or broadcast messages received at said internetworking node to determine if a sending wireless node is to be registered or not registered to said internetworking node.' ('531 at 14:63-15:4.) The specification requires 'analyzing' and determining functions be carried out by software. (*Id.* at 12:37-40 (describing a "registration

routine 860."")) But as Dr. Mohapatra observed, "no additional description or algorithms are provided to indicate how such routine performs its function." (Ex. A, Mohapatra Rpt. at ¶61.)

Netgear contends programming steps for the registration routine are detailed in teachings on registration "according to a hierarchy" or "based on signal strength." (D.I. 113 at 9.) Such teachings do not constitute disclosure of an algorithm; they merely make passing reference to possible criteria on which registration decisions could be based; there is no explanation as to how the decisions are carried out. Netgear's arguments are unavailing; 'means for analyzing to determine' is indefinite for lack of corresponding structure.

### 7.      'means for marking registration status' (claim 7)

Ruckus "asserts a Section 112 indefiniteness position and offers no construction for the structure," because there is no corresponding structure as required by §112, ¶6. (D.I. 113 at 10.) Notwithstanding, Netgear does not dispute, that 'registration status' be construed as "an indication as to whether there exists an association to an access point." (*Id.*; D.I. 112 at 9-10.) Claim 7 recites 'means for marking registration status of wireless node in the indicia column.' The specification provides only that "[t]he topology tables are also used by each AP to keep track of whether or not a wireless node is registered to it"; Figure 5 depicts a topology table with a column showing registration status of wireless nodes. ( '531 at 8:3-4, 15:5-7; FIG. 5.) The specification also notes an AP may register or "deregister" a wireless node. (*Id.* at 9:1-11.) There is no disclosure, however, regarding algorithms for marking registration status.

Netgear argues that disclosing algorithms is unnecessary, because "steps of marking status in the column of a table appear to be functions a general purpose processor could supply." (D.I. 113 at 10, n.6 (citing *In re Katz*, 639 F.3d at 1316.)) *Katz*, however, recited only generic functions (*e.g.*, "processing," "receiving," and "storing") and the Federal Circuit later clarified,

"[i]t is only in the <u>rare circumstances</u> where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed." *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) (emphasis added). Marking registration status in an indicia column is not a generic function of a general purpose computer. To perform such function, a general purpose computer would need to be adapted to contain a 'topology table' and to be capable of determining registration status and subsequent marking.

Netgear alternatively insists that "[t]he 'marking' that indicates the status of a node can plainly be performed by a CPU . . . after steps have been performed for determining whether to register the wireless node in claim 6," but fails to provide support for such an assertion. (D.I. 113 at 9-10.) Where there is total omission of structure (*i.e.*, algorithms for performing marking function), structure cannot be inferred. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1337 (Fed. Cir. 1999) (holding "[f]ulfillment of the §112, ¶6 tradeoff cannot be satisfied when there is a total omission of structure"); *Noah Systems*, 675 F.3d at 1313 (finding "[w]here no structure appears, the question is not whether the algorithm that was disclosed was described with sufficient specificity, but whether an algorithm was disclosed at all.").

8.      **'means for broadcasting' (claim 8)**

This term is indefinite for lacking corresponding structure. (D.I. 112 at 10.) The specification expressly teaches that a "beacon generator" software routine carries out the function of "broadcasting the internetworking node's address." ('531 at 12:34-35.) Netgear ignores this mandate and argues that a transmitter performs this function, while failing to identify any teaching clearly linking the transmitter to broadcasting. (D.I. 113 at 10.) *Texas Digital Systems*, 308 F. 3d at 1208 (requiring that "the specification or prosecution history clearly links or associates that structure to the function recited in the claim"). There is no algorithm associated

with the so-called software routine, nor any explanation as to how the function is carried out. (*See* Ex. A, Mohapatra Rpt. at ¶67.) As such, 'means for broadcasting' is indefinite.

B.   **The '480 Patent**

1.   **'optimal conditions' (claims 1 and 12)**

'Optimal conditions" does not allow skilled artisans, let alone a jury, to determine the metes and bounds of the claim. Claim 1 recites 'monitoring frequencies, having a plurality of polarizations, used for RF data transmissions for optimal conditions for said RF data transmissions.' ('480 at 7:37-39.) Claim 12 similarly uses "optimal conditions." (*Id.* at 8:32-34.) While "optimal" is a non-technical term with the plain meaning of "most desirable or satisfactory," it remains a term of degree that fails to provide precision as to what conditions are encompassed. *Datamize*, 417 F.3d at 1351 (requiring the "specification supplies some standard for measuring the scope" of such terms.) Netgear's construction is self-referring and uses ***more*** terms of degree ("most desirable") offering no clarity as to what <u>is</u> a  "condition" or how it is "desirable."

The '480 patent's only reference to 'conditions' concerns environmental conditions that affect signals. ('480 at 3:6-13.) "Interference" is referred to as a type of environmental condition. (*Id.* at 5:11-14.) The specification has no other references to "conditions." Conversely, the only references to 'optimal' characterize signals or network devices, <u>not</u> environment. (*Id.* at 4:18; at 5:10, 33-34, 40; 6:35, 41-43 (describing "optimal antenna beam," "optimal hub," "which polarization is optimal," "which path is optimal," "optimal subscriber transmission frequency," "optimal subscriber transmission polarity," and "optimal subscriber receive polarity.")) Without direction as to assessing whether a <u>condition</u> is 'optimal,' Dr. Sabharwal could only conclude that the term is insolubly ambiguous and therefore indefinite. (Ex. B, Sabharwal Rpt. at ¶166.)

Netgear argues that indefiniteness claims concerning the term "optimum" have been rejected in the past. (D.I. 113 at 13 (citing *Emcore Corp. v. Optium Corp.*, No. 6-1202, 2008 WL 3271553, *7 (W.D. Penn. Aug. 5, 2008.)))  Netgear's argument is misplaced. Despite some overlap in language, *Emcore* was informed by a different specification and prosecution history. The intrinsic evidence here compels a different conclusion: a lack of discernible meaning.

### 2.      **'subscriber station transmitter' (claims 1 and 13)**

A 'subscriber station transmitter' is "a transmitter at a station that has undertaken a subscription" in accordance with plain meaning. (D.I. 112 at 4.) Claims 1 and 13 both recite a 'subscriber' as existing in a "system," requiring the 'subscriber' undertake a subscription to other devices in the system. (*Id.* at 8:39-41.) The specification, too, identifies two types of stations: (1) base stations or hubs and (2) 'subscriber' stations. (*Id.* at 2:9-12, 17-20 (noting "[i]n a fixed point to multipoint wireless data transmission <u>system</u> problematic variations arise in the path between the <u>hub</u> and a <u>subscriber</u>" (emphasis added..))  Netgear's construction ignores the term 'subscriber' and should be rejected whereas Ruckus's construction gives meaning to the term.

### 3.      **'bit error rate' (claims 3 and 15)**

Ruckus submits that plain meaning should apply.

### 4.      **'angularly diverse' (claim 12)**

Ruckus submits that plain meaning should apply.

### 5.      **'means for monitoring' (claim 12)**

This term is indefinite for lack of corresponding structure. The only references to 'monitoring' RF data transmission frequencies take place at a "hub." ('480 at 2:50-53; Abstract.) The "hub" is identified as ***the location***, rather than ***a structure*** that performs the monitoring. There is no algorithm or circuitry within the hub capable of carrying out the 'monitoring'

function. The "hub" is a black box lacking any components or algorithms for <u>how</u> to perform

those functions as required by §112, ¶6. Merely understanding a hub to perhaps have some

structure is insufficient. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366-67

(finding that a "bank computer" did not provide sufficient structure under §112, ¶6 despite

arguments that a computer could be programmed to carry out the claimed function.)

Netgear proposes a structure of "one or more transceivers." (D.I. 112 at 5.) Nothing cited

by Netgear serves to link transceivers to the 'monitoring' function or any algorithms or circuitry

for carrying out the same. *See Texas Digital Systems,* 308 F. 3d at 1208. Netgear also

mischaracterizes the testimony of Ruckus's technical expert as purportedly admitting that a

wireless transceiver having components for monitoring RF signals was well-known in the art.

(D.I. 113 at 16.) Ruckus's expert merely confirmed that he could see the prior art referenced by

Netgear's counsel, but offered no testimony or opinion as to its substance. (D.I. 113, Ex. B at

318:17-319:20.) 'Means for monitoring' should thus be found indefinite as proposed by Ruckus.

6.     **'means for selecting' (claim 12)**

No structure (*i.e.*, algorithm or circuitry) is disclosed for the 'selecting' function. Netgear

argues that the 'selecting' function is carried out by switches. (D.I. 112 at 3; D.I. 113 at 16-17.)

The 'switches' relied upon by Netgear, however, do not perform "selecting." Nor do they

respond to any commands so as to be capable of 'selecting' a particular antenna beam <u>in</u>

<u>response to</u> 'optimal conditions.' The switches are merely a mechanism through which different

antenna beams are "fed" to a receive path. ('480 at 4:38-40.) In sum, there is no disclosed

structures tied to 'selecting.' *See Texas Digital Systems,* 308 F. 3d at 1208. 'Means for selecting'

should be found indefinite under §112, ¶6.

C.     **The '143 Patent**

13

The '143 patent concerns interference mitigation through gain control. Prior art gain control circuits were already known, however, to mitigate certain effects of interference. As Netgear's expert testified, "[r]adio wave propagation involves waves traveling over long distances, and through, around, and between obstructions . . . and on that journey the radio waves lose a lot of the energy," and "a <u>common</u> need for gain . . . would increase the size of the signal, power, current, voltage terms, for example to a level . . . to allow the receiver to decode, demodulate, detect the signals." (Ex. C, Saunders v1 at 22:1-6, 9-15.) The '143 patent purports to improve gain-based interference mitigation through data gathering and subsequent application.

### 1.    'operating a gain control circuit' (claim 13)

While Ruckus construes 'operating a gain control circuit' as "the act of operating a gain control circuit," Netgear construes "gain control circuit" as a "circuit that controls the gain of an apparatus that receives wireless data transmissions." (D.I. 112 at 13.). Netgear's construction would read out certain terms ('operating') while importing others ("apparatus that receives wireless data transmissions"). Ruckus's construction hews more closely to the express claim language while remaining consistent with dependent claim 19, which refers to transmitters (*e.g.*, 'scheduling RF transmissions') and not receivers. ('143 at 7:54-8:5.)

'Gain' generally refers to "signal levels," which while a concern in receiving wireless data, is not exclusive to the same. ('143 at 1:17.) While "Automatic Gain Control (AGC) is used in virtually all radio receivers," the converse (*i.e.*, that virtually all AGC are used in radio receivers) is <u>not</u> true. ('143 at 1:15-16.) Netgear's construction is therefore misleading in that it implies radio receivers are the ***only*** apparatuses that use gain control circuits.

Netgear's construction is also inconsistent with admissions during prosecution as to gain control circuits being present in prior art transmitters. (D.I. 115 at A-1295-96.) The applicants

14

tried to distinguish the prior art by adding "receiver" to the claims.  This addition would be unnecessary and redundant if 'gain control circuit' inherently referred to receivers. *Id*. at A-1289.) 'Gain control circuit' should therefore be construed without reference to any receivers.

With respect to 'operating,' Netgear cites "[s]ystem operators are free to operate wireless equipment in three sub-bands." (D.I. 113 at 18 (citing '143 at 2:13-15)). Ruckus <u>agrees</u> that 'operating' should be construed in accordance with the specification excerpt cited by Netgear, which Ruckus submits refers to the act of operating equipment. Netgear has no dispute with Ruckus over 'operating' and has not proposed an alternative construction. *Id*. All claim terms are presumed to have meaning and Ruckus's construction is the only one that assigns meaning to 'operating.' *Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111, 1118-19 (Fed. Cir. 2004.) Ruckus's construction should therefore be adopted.

2.      **'periodicity' (claim 13)**

Contrary to Netgear's construction, "repetitive" and "periodicity" are not interchangeable. (D.I. 112 at 13.) The specification discloses "a repetitive event with a tabulated period," which uses the terms "repetitive" and "period" to describe different aspects of "event." ('143 at 5:53-54.) While "repetitive" refers to the characteristic of repeating ('143 at 5:15 ("repeating frequency); 5:43 ("repetitive properties")), "period"/"periodicity" refers to "period of time." ('143 at Abstract; 3:43). This aligns with Ruckus's construction (*i.e.*, having the characteristic of occurring at an interval). (D.I. 112 at 13.) While Netgear argues "interval" is vague,  it is at least as clear as "period of time," while excluding the ambiguities of "period" disclaimed in the prosecution history:

- "Jagger's use of the word 'periodic' has a separate and distinct meaning from claims [sic] 1's use of the word 'periodicity'" (D.I. 115 at A-1219.)
- "Jagger only teaches gathering the "time of occurrence, frequency, and duration of interfering signal presence." *Id*.

- "Fullerton further teaches collecting parameters 'from a receiving station to aid in predicting noise periodicity.'" *Id.* at A-1388.

Netgear argues that the plain meaning of "periodic events" supports its construction. (D.I. 113 at 19.) But in distinguishing 'periodicity' from the admitted prior art, the applicants disavowed such meanings thereby limiting the claim scope, which now binds Netgear. (D.I. 115 at A-1219); *American Piledriving Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011.) Netgear's construction improperly relies on a disclaimed term ("periodic") and encompasses disclaimed aspects ("frequency").  Ruckus's construction properly bars Netgear from recapturing claim scope surrendered in prosecution.

3.   **'receiver gain of said gain control circuit' (claim 13)**

Ruckus construes 'receiver gain' as gain (*i.e.*, signal levels) of signals located at a receiver. (D.I. 112 at 13.) Netgear's construction (*i.e.*, "gain of an apparatus") uses 'gain' to characterize the <u>receiver</u> rather than signals, which is inconsistent with plain meaning, the specification, and Netgear's own expert testimony. (*Id.*; *see* '143 at 1:16-17 (stating "AGC is necessary to keep <u>signal levels</u> within a range"); Ex. C, Saunders v1 at 21:19-20 (stating "gain is the process of increasing the strength <u>of a signal</u>")). Netgear's construction creates ambiguity as the gain would be both 'of said gain control circuit' and "of an apparatus that receives wireless signals." Ruckus's construction better aligns with the intrinsic record.

D.   **The '454 Patent**

1.   **'fixed relationship' (claim 1)**

The preamble 'method for mitigating the effects of interference in an RF band data transmission system wherein transmitter and receiver are in fixed relationship to each other' should be construed as a limitation because it recites structure (*i.e.*, 'RF band data transmission system containing a transmitter and a receiver') and antecedent basis for 'said data

transmissions.' ('454 at 8:60-61); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (the preamble is limiting if it recites essential structure or steps.)

The parties agree that 'fixed relationship' means "stationary." (D.I. 112, 4.) Netgear inexplicably, however, seeks to import "during a wireless data transmission." (D.I. 113 at 20.) Precedent requires claim terms be given their broadest reasonable interpretation consistent with the specification. (*Phillips*, 415 F.3d at 1316.) The specification contradicts Netgear's construction as "the users of a fixed wireless system are, by definition, fixed and not moving." ('454 at 4:21-24.)  Netgear's construction should be rejected.

### 2.    'ascertaining a type of said interference' (claim 1)

Netgear construes this term as "ascertaining a group, kind, or class of the interference," whereas Ruckus proposes "ascertaining the category or characteristic of the interference." (D.I. 112 at 4) (emphasis added.) Netgear argues that its construction "uses the plain meaning of 'type,'" without support. (D.I. 113 at 21). Ruckus's construction is consistent with the specification, which states "the location or direction of the interference and its type are determined at box 414" and "[t]hen a determination is made as to whether the interference is periodic." ('454 at 8:16-21.) Periodicity is a characteristic of interference, consistent with Ruckus's construction.

### 3.    'interference is periodic' / 'any periodicity of said interference' (claims 1/14)

Netgear construes 'periodic interference' as "having a characteristic of interference from a periodic source." (D.I. 112 at 4). Such a construction begs the questions: What constitutes a "periodic source?" What is a "characteristic of interference" from such a source?  Netgear's construction is also circular, defining 'periodic interference' using the terms "periodic" and "interference."  Such construction also improperly imports "source" into claims.

Ruckus construes 'periodic' to characterize interference "occurring at an interval," which comports with the claim language and teachings that "if the interference is periodic or comes at a known time, the scheduling of the transmission can take place around occurrences of the interference." (*Id.*; '454 at 7:38-40.) The foregoing indicates that 'periodic interference' occurs at a known interval of time.  Ruckus's construction should be adopted.

4.   **'generating a data transmission pattern with a null in the direction of said interference' / 'a data transmission antenna pattern with a null in the direction of said interference' (claims 1/14)**

Netgear defines 'null' as an antenna pattern "with suppressed gain," while Ruckus defines "null" as an antenna pattern having a "zero characteristic." (D.I. 112 at 5-6.) Neither the claims nor specification provides a definition for "null." Netgear argues that "nowhere does the '454 patent describe an antenna pattern having a 'zero' characteristic or how a 'zero' characteristic could be used to suppress interference," while conveniently failing to mention there is a similar lack of support for "with suppressed gain." (D.I. 113 at 21.) Netgear's construction adds ambiguity rather than clarity, as suppressed is a term of degree without any standard for measuring suppression. Ruckus's construction is measureable, concrete, and consistent with plain meaning of 'null' as 'being or amounting to zero.'

The definition provided in Netgear's *IEEE Standard Definition of Terms for Antennas*, is consistent with Ruckus's definition, defining "directional null" as a "sharp minimum in a radiation pattern that has been produced for the purpose of direction-finding or the suppression of unwanted radiation in a specified direction." (D.I. 113 at 22.) (emphasis added). A "sharp minimum" indicates the lowest possible value and is consistent with a "zero characteristic." It is not consistent with Netgear's construction of "suppressed" gain, rather than "sharp minimum" gain. Dr. Warren Stutzman, too, opined that "the term 'null' is consistent with what a person of

ordinary skill in the art would also term a 'zero characteristic.' A zero characteristic is an

idealization of a null. . . .   A characteristic of zero in the direction of interference in the Ruckus

definition is equivalent to null formation, and this was well known in the art at the time the '454

Patent was filed."  (Ex. D, Stutzman Rpt. at ¶94.)

### 5.   **'narrow antenna beams' (claims 2/16)**

'Narrow antenna beams' is indefinite for lack of discernible meaning under §112, ¶2. The

specification notes only that "narrow beams cover less area than a wide beam system," but does

not explain what constitutes said system. No standard is provided by which to measure the scope

of 'narrow,' thereby failing to inform the public what is a 'narrow antenna beam.'

Netgear construes 'narrow antenna beams' as "antenna beams focused in directions for

communicating with particular receiving devices." (D.I. 113 at 7.) Antenna beams of <u>any width</u>,

however, can be focused and directed to communicate with a receiving device. Though Netgear

refers to the disclosures in U.S. Patent No. 5,563,610 ('the '610 patent), incorporated by

reference into the '454 Patent, the '610 patent only makes reference to 'narrow' and "wide"

beams without defining what constitutes either. The '610 patent notes that 'narrow' beams are

"more highly directional." ('610 at 6:60-31.) This substitutes one term of degree for another.

Netgear's own expert highlighted the indefinite nature of this term when he was asked

"how narrow is narrow?," he answered "it depends." (Ex. C, Saunders v1 at 293-94 (explaining

that "it depends on the environment and the system that you are working in . . . . In some systems

that could be <u>one degree</u>, in others it could be <u>180 degrees</u> or even more") (emphasis added.)) Dr.

Saunders further opined that the term is "defined in terms of being effective," which potentially

encompasses ***any and all*** possible widths of antenna beams. *Id*. This is the very definition of

indefinite. (*Halliburton Energy Services*, 514 F.3d at 1255 (holding "[w]hen a proposed

construction requires that an artisan make a separate infringement determination for every set of circumstances . . . and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite.")) 

### 6. **"multibeam antenna" (claim 14)**

"Multibeam antenna" lacks written description under 35 U.S.C. §112, ¶1. There was no generally accepted meaning for "multibeam antenna" at the time the '454 patent was filed. (Ex. D, Stutzman Rpt. at ¶212.) The specification does not define this term, which therefore lacks written description support. Netgear does not dispute the lack of written description in its opening claim construction brief. As such, this term in incapable of construction.

### 7. **'at least one scanner determining, [sic] a frequency, bandwidth and any periodicity of said interference' (claim 14)**

Netgear defines 'scanner' as an "RF receiver capable of being used to determine a frequency, bandwidth, and any periodicity of said interference in RF frequencies of interest," citing the abstract as providing "a scanner determines the frequency, bandwidth and any periodicity of the interference." (D.I. 113 at 23.) Like Netgear's construction, such teaching describes what a scanner <u>does</u> (*i.e.*, function) not what a scanner <u>is</u> (*i.e.*, structure). Netgear also cites a teaching on a "scanning receiver" that scans "the frequencies in the band of interest." *Id.* That teaching refers, however, to a "scanning <u>receiver</u>," not a "scanner." If the applicants had meant to refer to the same thing, there is a strong presumption that they would have used the same language. (*August Tech. Corp. v. Camtek, Ltd.,* 655 F.3d 1278, 1284 (Fed. Cir. 2011) (finding that "wafer" and "wafers" were not synonymous because the contrary reading would "render[ ] any difference between the singular and the plural terms superfluous.")) The cited teaching only indicates what a scanning receiver does; the described function (*i.e.*, scanning frequencies) is readily different from those recited for a scanner (*i.e.*, 'determining' frequency,

bandwidth, and periodicity).  'Scanner' is thus subject to §112, ¶6 and lacks a generally accepted

definition that encompasses structure. As Dr. Stutzman opined, "I do not believe the term

'scanner' had a meaning commonly discernible to one of ordinary skill in the art at the time of

application for what became the '454 Patent" and "[r]ather, one of ordinary skill in the art would

understand that there are numerous possible meanings of the term scanner." (Ex. D, Stutzman

Rpt. at ¶231.) Because there is no disclosed structure to perform the recited function, 'scanner'

should be found indefinite. *See Altiris,* 318 F.3d at 1375-76.)

E.      **The '035 Patent**

1.      **'base station' (claim 1)**

The specification describes 'base station' as part of a "mobile cellular communication

system" and that "functions as a bridge between mobiles and landline networks." ('035 Abstract

at 1:18-19.) Such references are consistent with Ruckus's construction (*i.e.*, a section of a

cellular telephone network handling signaling between a mobile phone and a network switch)

than Netgear's (*i.e.,* a station having a wired connection to a data network that may be used by at

least one mobile station to communicate with a wired network). (D.I. 112 at 14.)

The background of the '035 patent cites several patents that identify the relevant field of

art as cellular mobile telephone systems. ('035 at 1:27-40 (citing Maile, Kaewell, and Gordon

patents); Ex. E, Maile at Abstract, 1:6-8 (describing an "invention [that] relates . . . [to a]

cordless telephone system".); Ex. F, Kaewell at Abstract (describing "mobile telephone

networks"); Ex. G, Gordon at 3:33-35 (describing "a fixed cell site 12 . . . in connection with

cellular mobile radio telephone service.")). As a part of the intrinsic record, the cited patents use

'base station' in a manner consistent with the construction proposed by Ruckus.

Netgear's proposed construction improperly imports "the exemplary embodiment" (e.g.,

data transmissions generally) into the claims. (D.I. 113 at 25); (*see Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).) But even if it were not improper, Ruckus's construction would not exclude those embodiments, as evidenced by the cited patents which teach data transmissions in cellular mobile telephone systems. (See *e.g.,* Ex. F, Kaewell at 3:25-26 ("compressed data"); Ex. G, Gordon at 5:22 ("data stream.")) Ruckus's construction should be adopted.

### 2.   **'mobile station' (claim 1)**

While Netgear argues that 'mobile' refers merely to the capability of being moved, base stations are also capable of being moved (*e.g.*, installation, renovation, as permitted by wiring schemes). (D.I. 112 at 14.) It is the ability to move during ***normal operation*** (*i.e.*, portability) that differentiates a mobile station from a stationary base station. The specification expressly differentiates "stationary units such as base stations" from  "mobile units such as mobile stations." ('035 at 6:11-14.) The specification also notes that while "***mobile stations are moving***, the invention as described, chooses the best combination of transceivers." (*Id.* at 8:54-56) (emphasis added). The defining characteristic of a 'mobile station' is operational mobility as found in Ruckus's construction (*i.e.*, a mobile device).

Claim terms may be defined by disclosures that are incorporated by reference. (*Advanced Display Sys's. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).) Incorporation by reference effectively makes the teachings of U.S. patent 5,123,029 (Bantz) and patent application 07/605,285 (Natarajan) part of the '035 patent as if explicitly contained therein. ('035 at 1:63 (incorporating Bantz by reference); Ex. H, Bantz at 1:14 (incorporating Natarajan by reference.)) Bantz distinguishes "fixed" base stations from "hand held" or "lap top" mobile stations (Ex. H, Bantz at 1:23, 4:37-38), while Natarajan describes "portable data processing devices, referred to

herein as mobile communication units or <u>mobile units</u>." (Ex. I, Natarajan at 1:12-13.)  Likewise,

the related art uses 'mobile' to refer to portable devices that can be mobile during usage. (Ex. E,

Maile at 1:11-15 (disclosing "remote <u>portable</u> transceivers, *e.g.*, a handset"); Ex. F, Kaewell at

2:20-22 (noting that "mobile systems will eventually include both the <u>portable or hand-carried</u>

telephone type and the <u>vehicle-mounted</u> type"); Ex. G, Gordon at 1:49-51 (disclosing "<u>moveable</u>

transceivers or <u>mobile units</u>."))

Netgear's expert's published literature distinguishes between "fixed and mobile systems"

by describing "fixed" systems as "radio systems involving a pair of stations mounted on masts,"

while noting that "the <u>mobile moves</u> through the system coverage area, it crosses cell boundaries

and thus has to change channels." (Ex. J, Saunders Antennas at 3, 13, 105.) Ruckus's

construction captures this distinction and should therefore be adopted..

3.     **'means . . . for determining' (claim 1)**

Claim 1 of the '035 patent further includes the following element:

means in the base station for determining which one of said multiple antennas
received data most successfully, during a last reception by said base station with
this antenna being referred to as a preferred antenna of said base station.

('035 at 9:33-38.) The claimed 'means for determining' refers to multiple claim terms, some of

which (*e.g.*, 'base station,' 'most successfully') are disputed - on different bases - and some of

which (*e.g.*, 'determining') are not in dispute. Netgear disingenuously conflates Ruckus's

arguments regarding different terms and as conflicting. (D.I. 113 at 27.) Here, Ruckus contends

there to be no structure as required by §112, ¶ 6.  Other parts of the claim element may be

construed per plain meaning subject to other disputed terms herein. (D.I. 112 at 14.)

In accordance with plain meaning, 'determining' refers to making a determination (*e.g.*,

which antenna is most successful and thereafter preferred). 'Determining' which antenna is

preferred is therefore distinct from 'selecting' which is recited separately in other claim elements (*e.g.*, 'controller . . . selecting the preferred antenna' and 'means . . .to select . . . the preferred antenna in absence . . .'). ('143 at.9:49-55.) Netgear's reference to "selections" conflates 'determining' with 'selecting' and is not useful in construing the phrase. (D.I. 113 at 26.)

While Netgear refers to disclosed determinations based on, *inter alia*, "higher received signal energy," "error-detecting code or checksum," or "acknowledgements," it misstates the teachings to the extent that any of these determinations are attributed to a controller. (D.I. 113 at 26.) Nothing in the language of the claims or the specification links a controller to any instance of 'determining.' *Texas Digital Systems,* 308 F. 3d at 1208 (requiring a clear link of "structure to the function recited in the claim"). Instead, the specification provides:

> whether a packet has been more successfully received is determined at the end of packet reception. The preferred means for this indication is the success or failure of the computation of an error-detecting code, or checksum. In general, this is a powerful and effective means of determining packet reception success.

('035 at 5:24-30 (emphasis added.)) No algorithms were provided for the "error-detecting code or checksum." The specification also states that "[t]he signal indicates which, if any, of the transceivers 12 and 13 successfully received the packet" and that "signals 22 and 23 from the base station, transceivers 12 and 13, respectively, indicating their respective success in receiving packets." (*Id.* at 5:61-63, 6:24-26.) Likewise, the applicants explicitly stated during prosecution that the structure for 'means for determining' under §112, ¶6 is the "higher received data signal" or "error correction methods." (D.I. 114 at A-276 (stating that "in a number places [sic] the specification states that higher received data signal can be used to determine the more successful of two antennas".)). Such evidence indicates that 'means for determining' corresponds to "error-detecting code or checksum" or "signals," which do not qualify as structure under §112, ¶6.

FIG. 4 is "a flow chart of a stationary [base] station controller's actions." ('035 at 2:55-

56.) Actions as described therein do not include any determination. Instead, "[t]he base station controller 16 <u>first</u> examines the preferred base station transceiver table 30 at block 40." (*Id.* at 6:49-50.) Thus, the determination of which antenna is preferred (so as to be included in the table) has already been made before the base station controller even performs its "first" action.

When the claimed function of 'determining' is construed in accordance with its plain meaning consistent with the specification and prosecution history, it becomes evident that there is no disclosed structure that performs the function of 'determining' as required by §112, ¶6. Netgear's construction should therefore be rejected as inconsistent with the context of the claims, specification, and prosecution history, and Ruckus's construction adopted.

4.    **'received data most successfully' (claim 1)**

Ruckus contends that 'received data most successfully' is indefinite for lack of discernible meaning under §112, ¶2. (D.I. 112 at 14.) The USPTO made a rejection on this same basis, but withdrew it after clarifying language was added to the specification, indicating that the Examiner considered "most successfully" indefinite absent such clarification. (D.I 114 at A-164, 283.) Ruckus submits that the clarifying language should be excluded from consideration due to impermissibly adding new matter and the original bases for finding "most successfully" indefinite apply. (35 U.S.C. §132 ("no amendment shall introduce new matter."))

The original specification describes the result of the "error-detecting code, or checksum" in binary terms ("success or failure") pertaining to a single reception:

> the only indication of <u>whether a packet has been successfully received</u> is determined at the end of packet reception. The preferred means for this indication is the <u>success or failure</u> of the computation of an error-detecting code, or checksum.

(D.I. 114 at A-76.) In response to the indefiniteness rejection, applicants sought to amend the specification to add the word "more" to indicate that "the only indication of whether a packet has

been <u>more</u> successfully received is determined at the end of packet reception." (*Id.* at A-221.) The addition of 'more' implies a comparison among multiple values measuring success, which are not provided by binary results of a single reception as originally disclosed for "error-detecting code, or checksum" or "acknowledgements." Such an amendment changes the meaning of the original disclosure and is new matter. (*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F. 3d 1338, 1344 (Fed. Cir. 2008) (stating that "[t]his court has consistently recognized that the Patent Act prevents an applicant from adding new subject matter during the patent prosecution process.")) When that amendment proved insufficient to overcome the indefiniteness rejection based on 'most successfully,' the applicants sought to add even *more* new subject matter:

> Page 11, line 7, after the period "." add -- While in certain circumstances use of error correction or checksum schemes are preferable, either of those schemes or the measurement of received signal strength can be used to determine which antenna received "most successfully."

(D.I. 114 at A-268.) It was only after submission of this amendment that the applicable indefiniteness rejection was withdrawn. (*Id.* at A-283.)  Notwithstanding the issue of entry, the USPTO had officially adjudged 'most successfully' to be indefinite absent clarification. Consequently, if that clarifying language is properly excluded for constituting new matter, "most successfully" would remain indefinite, as advanced by Ruckus.

5.    **'means for selecting' (claim 1)**

Claim 1 of the '035 patent further includes the element 'means in said at least one mobile station for selecting one of said multiple antennas in such mobile station as a preferred antenna.' ('035 at 9:39-41.) The 'means for selecting' in the mobile station tracks the same language as 'means for determining' in the base station discussed above. For the same reasons provided above with respect to 'means for determining,' Netgear's references to "antenna selection" do not apply to 'means for selecting,' an element that is separate and distinct from the element

26

separately reciting 'controller . . . selecting <u>the</u> preferred antenna' discussed below. ('035 at 9:48-53.) While 'means for selecting' uses success in receiving data to select 'one' antenna to designate as preferred, the 'controller . . . selecting' refers to selecting 'the' already-designated preferred antenna for use in transmission. Section 112, ¶6 requires a structure to be clearly linked to the specific 'selecting' (*i.e.*, of a preferred antenna based on success) recited herein. *Texas Digital Systems,* 308 F. 3d at 1208.

There is no intrinsic evidence that clearly links a controller structure to the function of 'selecting' in this element. In describing FIG. 6 as "a flow chart which shows the actions of the mobile station controller," the specification states "[f]irst the preferred mobile station antenna register 58 is inspected." ('035 at 7:53-57.) As such, the selection of an antenna as preferred and thereafter included in the register has already been made when the mobile station controller performs its "first" action. Further, agents other than a controller are disclosed as performing the 'selecting' based on successful reception  (*Id.* at 7:37-39 (describing "a <u>signal</u> on line 57 from the mobile station transceiver 4 indicating that the last packet <u>reception was a success</u>."))

It otherwise remains disingenuous for Netgear to characterize Ruckus's arguments regarding different terms within an element as conflicting. (D.I. 113 at 27.) The term 'selecting' can be construed in accordance with plain meaning, thereby having a discernible meaning under §112, ¶2, and yet lack  corresponding structure under §112, ¶6.

The claimed basis for selecting an antenna as preferred is 'its<u> use to successfully receive data </u>during the last reception by that mobile station.' ('035 at 9:41-43.) The term 'the last reception' lacks an antecedent basis and is therefore indefinite under §112, ¶2 . *Halliburton*, 514 F.3d at 1249 ("a claim could be indefinite if a term does not have proper antecedent basis").

Although Netgear defines 'successfully receive' to mean "higher received signal energy

and/or successful error checking, and/or receipt (or lack of) receipt of acknowledgement packets," the specification refers to 'success' as distinct from such factors. (D.I. 112 at 15.) The specification discloses that "the only indication of whether a packet has been more successfully [sic] received is determined" and the "means for this <u>indication</u> is the success or failure of the computation of an error-detecting code, or checksum." ('035 at 5:25-29.). The means for identifying success (*e.g.*, "error-detecting code" and "acknowledgements") is not the same as the success itself, which exists regardless of whether it is identified. The specification states that "[i]f both are successful, the antenna with higher received signal energy becomes the preferred antenna." (*Id.* at 5:4-15.) Such usage indicates 'success' is distinct from 'higher signal energy,' as an antenna may be successful yet not have the higher signal energy. The foregoing also indicates that the basis for 'selecting' is not 'use to successfully receive data during the last reception,' as claimed, but inertia ("doing nothing") or signal energy. As there is no discernible meaning for 'successfully receive,' it should be found indefinite.

      6.    **'preferred antenna storage means' (claim 1)**

In arguing that "[m]eans plus function terms do not have plain meanings other than corresponding structures," Netgear confuses discernible linguistic meaning with legal sufficiency of disclosed structure under §112, ¶6. (D.I. 113 at 28.) Disclosed structure for 'preferred antenna storage means' does not necessarily provide a discernible meaning for a limitation that includes additional terms. Ruckus submits the term should be construed in light of plain meaning and prosecution history. (*See e.g.*,  D.I. 114 at A-248 (admitting the "Akaiwa patent does show . . . stor[ing] information from the last reception to be used in the next transmission."))

      7.    **'controller . . . selecting the preferred antenna' (claim 1)**

Claim 1 of the '035 patent recites:

a controller at said base station and said at least one mobile station which is responsive to said indicia stored in the preferred antenna storage means for controlling the transmission of data between the respective stations by selecting the preferred antenna at the respective stations

('035 at 9:48-53.) "Controller" lacks corresponding structure required by §112, ¶6. FIGs. 3 and

5 respectively illustrate a "base controller" and "mobile controller" as box diagrams with a

table/register and lines for incoming and outgoing signals:



Such controllers are "black boxes" representing function, but lacking structure. *Eplus, Inc. v.*

*Lawson Software, Inc.*, 700 F. 3d 509, 518-19 (Fed. Cir. 2012) (finding where "[t]here is no

instruction for using a particular piece of hardware, employing a specific source code, or

following a particular algorithm," "[t]here is therefore nothing in the specification to help cabin

the scope of the functional language in the means for"). Netgear argues 'controller' should be

construed as a device, but identifies no embodiments, components, or algorithms for performing

its purported functions. (D.I. 112 at 15.) Such a naked recitation is deficient under §112, ¶6.

8.     **'means for changing' (claim 1)**

Netgear argues that because plain meaning "is inadequate for this Section 112, ¶6

clause," the Court should therefore adopt Netgear's construction. (D.I. 113 at 29.) Netgear's

argument is misplaced. "The plain meaning of claim language ordinarily controls unless the

patentee acts as his own lexicographer and provides a special definition for a particular claim

term or the patentee disavows the ordinary scope of a claim term either in the specification or

during prosecution." (*Interdigital Communications v. Intern. Trade Com'n*, 690 F. 3d 1318, 1324

(Fed. Cir. 2012.)) Neither exception applies and Ruckus's construction should be adopted.

9. **'means for measuring' (claim 4)**

Ruckus contends that while structure is lacking under §112, ¶6, plain meaning should

otherwise apply. (D.I. 112 at 16.) The '035 specification explains that "[r]eceived signal strength

is measured at each antenna/transceiver." ('035 at 2:20-22.) Contrary to Netgear's construction, a

"transceiver" is not the agent performing the function of measuring, but rather the location where

the measurement occurs. (D.I. 112 at 16.) 'Means for measuring' should be found indefinite.

10. **'error correction means' (claim 5)**

The specification lacks written description for error "correction." 'Error correction

means' was added in an amendment and cannot constitute its own written description by virtue

of being part of the original disclosure. (D.I. 114 at A-268.) The only original reference to

"error" concerns "computation of an error-detecting code, or checksum." ('035 at 5:28-29.)

Notwithstanding the difference between 'correction' and 'detecting'/ 'checksum,' no structure is

disclosed per §112, ¶6. Netgear argues that corresponding structure is disclosed at column 5,

lines 27-29, which states "[t]he preferred means for this indication is the success or failure of the

computation of an error-detecting code, or checksum." (D.I. 112 at 17.) As discussed above, this

does not provide sufficient structure under §112, ¶6. Ruckus's construction should be adopted.

IV. **<u>CONCLUSION</u>**

Ruckus respectfully requests adoption of its constructions as set forth in D.I. 112 and as

explained in detail above.

Dated:  April 8, 2013                                 Respectfully submitted,


                                                      /s/
                                                      George Pazuniak (DE # 478)
                                                      PAZUNIAK      LAW      OFFICE      LLC
                                                      1201 North Orange Street
                                                      7th floor, Suite 7114
                                                      Wilmington, DE 19801-1186
                                                      GP@del-iplaw.com

                                                      Colby B. Springer (admitted pro hac vice)
                                                      CSpringer@LRLaw.com
                                                      LEWIS AND ROCA LLP
                                                      2440 West El Camino Real, Sixth Floor
                                                      Mountain View, CA 94040

                                                      Shane E. Olafson (admitted pro hac vice)
                                                      SOlafson@LRLaw.com
                                                      W. Brent Rasmussen (admitted pro hac vice)
                                                      BRasmussen@LRLaw.com
                                                      LEWIS AND ROCA LLP
                                                      40 North Central Avenue, Suite 1900
                                                      Phoenix, Arizona 85004

                                                      *Attorneys for Defendant Ruckus Wireless Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2013 I electronically filed the above document with the

Clerk of Court using CM/ECF which will send electronic notification of the above document to

all registered participants.

*/s/ George Pazuniak*
George Pazuniak (DE #478)