## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **NETGEAR INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 1:10-cv-00999-SLR** |
| | ) | |
| **RUCKUS WIRELESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## RUCKUS WIRELESS, INC.'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY

OF COUNSEL:

Colby B. Springer (pro hac vice)
CSpringer@LRLaw.com
LEWIS AND ROCA LLP
2440 West El Camino Real, Sixth Floor
Mountain View, CA 94040

Shane E. Olafson (pro hac vice)
SOlafson@LRLaw.com
W. Brent Rasmussen (pro hac vice)
BRasmussen@LRLaw.com
LEWIS AND ROCA LLP
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004

May 7, 2013

George Pazuniak (DE #478)
O'KELLY ERNST & BIELLI, LLC
901 N. MARKET ST.
SUITE 1000
WILMINGTON, DE 19801
TEL: 302-478-4230
GP@del-iplaw.com

*Attorneys for Defendant Ruckus Wireless, Inc.*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    LEGAL STANDARDS ............................................................................................ 1

    A.     Summary Judgment ...................................................................................... 1

    B.     Statutory Subject Matter and Lack Thereof Under 35 U.S.C. §101 ............ 2

    C.     Written Description and Lack Thereof Under 35 U.S.C. § 112, ¶ 1 .............. 3

    D.     Indefiniteness Under § 112, ¶2 Is A Purely Legal Issue.............................. 4

    E.     Indefiniteness of Means-Plus-Function Terms Under § 112, ¶6 ................. 6

III.   ARGUMENT............................................................................................................ 7

    A.     The '531 Patent ............................................................................................ 7

        1.     Background of the '531 Patent ......................................................... 7

        2.     Claim 6 of the '531 Patent is Indefinite Under §112, ¶6 ............... 8

    B.     The '480 Patent .......................................................................................... 10

        1.     Background of the '480 Patent ....................................................... 10

        2.     Claims 1 and 12 of the '480 Patent are Invalid Because 'Optimal
               Conditions' Lacks Discernible Meaning ....................................... 10

        3.     Claim 12 of the '480 Patent is Indefinite Under §112, ¶6 ........... 14

    C.     The '143 Patent .......................................................................................... 16

        1.     Background of the '143 Patent ....................................................... 16

        2.     Asserted Claims of the '143 Patent Lack Patentable Subject Matter Under
               §101..................................................................................................... 17

        3.     Asserted Claims of the '143 Patent Lack Written Description Support
               Under Section 112, Paragraph 1 .................................................... 22

        4.     Asserted Claims of the '143 Patent are Indefinite Under §112, ¶2 ......... 24

    D.     The '454 Patent .......................................................................................... 25

        1.     Background of the '454 Patent ....................................................... 25

        2.     Claims 1 is Invalid Because 'Relative Transmission Rate' is Indefinite for
               Lack of Discernible Meaning and Are Therefore Indefinite ................... 26

        3.     The '454 Patent Fails to Enable Persons of Skill in the Art to Ascertain a
               Type of Interference....................................................................... 28

        4.     Claims 2 and 16 are Invalid Because 'Narrow Antenna Beams' Lacks
               Discernible Meaning and Are Therefore Indefinite................................. 29

        5.     Claim 14 is Indefinite Because the Patent Fails to Define, and Recites No
               Corresponding Structure, for the 'Scanner' Limitation ........................... 30

    E.     The '035 Patent .......................................................................................... 31

        1.     Background of the '035 Patent ....................................................... 31

        1.     Asserted Claims of the '035 Patent Lack Patentable Subject Matter Under
               §101..................................................................................................... 32

        2.     Asserted Claims of the '035 Patent are Indefinite Under Section 112,
               Paragraph 2 .................................................................................... 34

        3.     Asserted Claims of the '035 Patent are Indefinite Under §112, ¶6 ......... 36

IV.   CONCLUSION ...................................................................................................... 40

i

## TABLE OF AUTHORITIES

## Cases

*Allen Eng'g Corp v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002).....................................26, 30

*Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) .............................4

*Ass'n for Molecular Pathology v. USPTO*, 689 F.3d 1303, 1334 (Fed. Cir. 2012) .......................................3

*Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999) ....................................1

*Bancorp Svcs. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)............................1

*Bilski v. Kappos*, 561 U.S. __, 130 S. Ct. 3218 (2010)...............................................................1, 3, 17, 32

*Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007)..............................................4

*Blackboard, Inc. v. Desire2Learn, Inc.*, 564 F.3d 1371, 1384 (Fed. Cir. 2009) ..........................................9

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002).......................31

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ...............................................................................40

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 685 F.3d. 1341, 1350-51 (Fed. Cir. 2012).....................................3

*Cybersource*.........................................................................................................................3, 19, 21

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011)............................................2

*Data Retrieval Technology, LLC v. Sybase, Inc.*, Case No. 08-CV-5481 (N.D. Cal., Nov. 8, 2010)...................12, 28

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005).......................4, 5, 14, 28

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) .........................................................2

*Diamond v. Diehr*, 450 U.S. 175, 185 (1981)........................................................................................2

*Eplus, Inc. v. Lawson Software, Inc.*, 700 F. 3d 509, 518-19 (Fed. Cir. 2012).......................................6, 38

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518 (Fed. Cir. 2012) ................................................15

*Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) .........................7, 8, 39

*Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) ............................................6

*Girafa.com, Inc. v. IAC Search & Media, Inc.*, 2009 WL 30747121, at *2 (D. Del. Sep. 25, 2009)..............13, 28, 30

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008)........................... passim

*In re Abele, 684 F.2d 902 (C.C.P.A. 1982)* .........................................................................................2

*In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) .................................................................. 1, 6, 9, 37

*In re Nuijten*, 500 F.3d 1348, 1354 (Fed Cir. 2007) ........................................................................ 21, 33

*Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350 (Fed. Cir. 2011) ............................ 31

*MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377, 1381-82, 84 (Fed. Cir. 2012) ............. 27

*Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013) ............... 31

*PowerOasis, Inc. v. T-Mobile USA*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) ................................................ 4

*Saffran v. Johnson & Johnson*, No. 2012-1043, 21 (Fed. Cir. 2013) .......................................................... 6

*Scimed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ........................... 32

*Selex Comm., Inc. v. Google Inc.*, 2013 WL 1412334, *5 (N.D. Ga. Apr. 8, 2013) ......................... 9, 14, 15

*SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed.Cir.2010) ............................... 3, 18, 20

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ........................................... 26

*Typhoon Touch Tech., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384-85 (Fed. Cir. 2011) ................................... 10

*Welker Bearing Co. v. PhD, Inc.* 550 F.3d 1090, 1097 (Fed. Cir. 2008) ............................................... 6, 7

## Statutes

§112 ............................................................................................................................................... passim

35 U.S.C. § 101 ........................................................................................................................ 2, 19, 32

35 U.S.C. § 112 ............................................................................................................................ passim

## Rules

Fed. R. Civ. P. 56(a) ............................................................................................................................ 1

Fed. R. Civ. P. 56(c) ............................................................................................................................ 1

## I.    INTRODUCTION

The asserted patents include U.S. patent numbers 5,507,035 ("the '035 Patent"),

5,812,531 ("the '531 Patent"), 6,512,480 ("the '480 Patent"), 6,621,454 ("the '454 Patent"), and

7,263,143 ("the '143 Patent") (collectively the "Patents-in-Suit"). The Patents-in-Suit are invalid

for failing to comply with one or more of Section 101 of Title 35 or paragraphs one, two, or six

of Title 35, Section 112.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The movant must support the assertion by "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In patent cases where claim terms have not yet been construed, a court may nevertheless

consider questions of patentability. *Bancorp Svcs. v. Sun Life Assur. Co. of Canada*, 687 F.3d

1266, 1273 (Fed. Cir. 2012) (noting that claim construction is "not an inviolable prerequisite to a

validity determination under §101"); see also *Bilski v. Kappos*, 561 U.S. __, 130 S. Ct. 3218

(2010) (finding claimed subject matter ineligible for patent protection without claim

construction). Likewise, a finding of indefiniteness on summary judgment renders claim

construction moot. *In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) ("If a claim is indefinite,

the claim, by definition, cannot be construed").  As such, the indefiniteness inquiry is

"inextricably intertwined" with claim construction. *Atmel Corp. v. Info. Storage Devices, Inc.*,

198 F.3d 1374, 1379 (Fed. Cir. 1999).

**B.      Statutory Subject Matter and Lack Thereof Under 35 U.S.C. §101**

"Whether a claim is drawn to patent eligible subject matter under § 101 is an issue of law." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012). Section 101 provides "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has identified several exceptions to patentability, including "laws of nature, natural phenomena, and abstract ideas." *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). These exceptions have been interpreted to encompass such subject matter as mental processes and products of nature. *Mayo Collaborative v. Prometheus Labs.*, 566 U.S. __, 132 S.Ct. 1289, 1324 (2012).

"Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011). But even where a claim literally invokes one of the statutory categories, such a claim may nevertheless lack statutory subject matter under Section 101. The *In re Abele* Court found that "[i]f the functionally-defined disclosed means and their equivalents are so broad that they encompass any and every means for performing the recited functions, the apparatus claim is an attempt to exalt form over substance." 684 F.2d 902, 909 (C.C.P.A. 1982). Further, the burden is on the patentee "to demonstrate that the claims [were] truly drawn to [a] specific apparatus distinct from other apparatus[es] capable of performing the identical functions." *Id*. Where the patentee fails to establish such specificity and distinction, "the apparatus claim will be treated as if it were drawn to the method or process which encompasses all of the claimed 'means'." *Id*.

For method claims, the Supreme Court has stated that "the machine-or-transformation test" and "precedents on the unpatentability of abstract ideas provide useful tools" for evaluating patentability. *Bilski*, 130 S. Ct. at 3227, 3229. Moreover, "to impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine 'must impose meaningful limits on the claim's scope.'" *CyberSource*, 654 F.3d at 1375. "In order for a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed." *SiRF Tech., Inc. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1333 (Fed.Cir.2010). As "computers play a role in every part of our daily life" in the modern age, "mere implementation on a computer of an otherwise ineligible abstract idea will not render the asserted 'invention' patent eligible." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 685 F.3d. 1341, 1350-51 (Fed. Cir. 2012).

Similar to the machine prong, the use of the transformation must impose meaningful limits on the claim's scope to impart patent-eligibility. *CyberSource*, 654 F.3d at 1369. The transformation must be central to the purpose of the claimed process. *Ass'n for Molecular Pathology v. USPTO*, 689 F.3d 1303, 1334 (Fed. Cir. 2012). Mere data gathering would not constitute a transformation of any article and can also be fairly categorized as insignificant extra-solution activity. *CyberSource*, 654 F.3d at 1370. Likewise, mere manipulation or reorganization of data does not satisfy the transformation prong. *Id*. at 1375. Nor is there a transformation where a step could conceivably be accomplished without the purported transformation. *Mayo Collaborative*, 132 S.Ct. at 1303.

## C.     Written Description and Lack Thereof Under 35 U.S.C. § 112, ¶ 1

Section 112, paragraph 1 requires that a patent specification "contain a written description of the invention and of the manner and process of making and using it." 35 U.S.C.

§ 112, ¶ 1. "[A]n adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials." *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010). "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id*. at 1351. The Federal Circuit has further articulated that the relevant inquiry for written description is "possession as shown in the disclosure," which "requires an objective inquiry into the four corners of the specification." *Id*. The issue of written description is "amenable to summary judgment in cases where no reasonable fact-finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

### D.      Indefiniteness Under § 112, ¶2 Is A Purely Legal Issue

Section 112, paragraph 2 requires that a patentee clearly define the metes and bounds of the claimed invention. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005). Indefiniteness is a question of law drawn from the Court's performance of its duty as the construer of patent claims. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007). Accordingly, courts routinely resolve the question of indefiniteness on summary judgment. *See, e.g., Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008); *Datamize*, 417 F.3d at 1356.

The specification of every patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. The purpose of the definiteness requirement is to ensure that the claims use language that "adequately notifies the public of the scope of the patentee's right to

exclude." *Datamize*, 417 F.3d at 1347 (finding claims "not amenable to construction" or "insolubly ambiguous" are indefinite under §112, ¶ 2). "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton*, 514 F.3d at 1251. Otherwise, competitors cannot determine how to avoid infringement, defeating the public notice function of patent claims. *Id.* at 1249.

Where the specification fails to provide "some standard for measuring" the scope of a term that term is indefinite. *Datamize*, 417 F.3d at 1347. Terms of degree, for example, do not provide an "objective measure" of what is encompassed. *Id.* at 1351. Without such a standard, the claim will not "delineate the scope of the invention," and therefore will not "adequately notif[y] the public of the scope of the patentee's right to exclude." *Id.* at 1347.

Mere assertions by an expert that a term of degree would be understood by those of ordinary skill in the art cannot defeat summary judgment because "the definition of [the term of degree] cannot depend on the undefined views of [] experts." *Id.* at 1352. **The patent itself** must provide an objective and definitive standard for measuring the degree that does not result in reading the term of degree out of the claims. *Id.* at 1352-55 (rejecting as insufficient an expert's identification of parameters that one of ordinary skill in the art might consider where the patent itself failed to provide a standard to measure whether the claimed term of degree would be satisfied). "When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite." *Halliburton*, 514 F.3at 1255.

### E.    Indefiniteness of Means-Plus-Function Terms Under § 112, ¶6

"Means-plus-function" claims are subject to Section 112, paragraph 6, which requires "the specification must contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013). "Determining the claimed function and the corresponding structure for a claim limitation written in means-plus-function format are both matters . . . present[ing] issues of law." *Aoyama*, 656 F.3d at 1296. Construing such claims is a two-step process:

> The first step in construing a means-plus-function claim limitation is to **define the particular function** of the claim limitation. The court **<u>must</u>** construe the function of a means-plus-function limitation to **include the limitations contained** in the claim language. . . . The next step in construing a means-plus-function claim limitation is to look to the specification and identify the **corresponding structure <u>for that function</u>**.

*Id*. at 1296-97 (citations omitted). "[A] court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Welker Bearing Co. v. PhD, Inc*. 550 F.3d 1090, 1097 (Fed. Cir. 2008). Moreover, the Federal Circuit has repeatedly held that "structure disclosed in the specification is 'corresponding' structure **only if** the specification or prosecution history **clearly links** or associates that structure **to the function** recited in the claim." *Aoyama*, 656 F.3d at 1297 (emphasis added); *Saffran v. Johnson & Johnson*, No. 2012-1043, 21 (Fed. Cir. 2013).

Describing the function to be performed without explaining *how* the function was to be performed is insufficient to support a means-plus-function claim. *Function Media*, 708 F.3d at 1318. General descriptions or illustrations of a "black box that represents the purchase-order-generation *function* without any mention of a corresponding structure" will result in a finding of indefiniteness. *ePlus, Inc. v. Lawson Software, Inc*., 700 F. 3d 509, 518-19 (Fed. Cir. 2012).

Recitation of nonce words or verbal constructs (*e.g.*, "device", "mechanism") may be understood as simply a substitute for the term "means for." *Welker Bearing*, 550 F.3d at 1096. For example, "recitation of 'control device' provides no more structure than the term 'control means' itself." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012).

Where the 'means' is a computer, paragraph 6 of Section 112 would "require the specification to disclose the algorithm for performing the function." *Id*. Cursory references to software "without providing some detail about the means to accomplish the function, is not enough." *Id.* (quoting *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012)). As Section 112, paragraph 6 is a **disclosure** requirement, even "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Id*.

## III.   ARGUMENT

### A.   The '531 Patent

#### 1.   Background of the '531 Patent

Claim 6 of the '531 Patent recites an internetworking node including a 'means to analyze' topology broadcast messages that are sent by wireless nodes in order to construct a 'topology table.' ('531 at 14:63-67.) The internetworking node also has a 'means for analyzing' the topology table or topology broadcast messages "to determine if a sending wireless node is to be registered or not registered to said internetworking node." ('531 at 15:1-4.) These means-plus-function limitations lack corresponding structure, thereby rendering claim 6 invalid.

2.      **Claim 6 of the '531 Patent is Indefinite Under §112, ¶6**

a.      **'means to analyze the topology broadcast messages and enter in said topology table the network addresses of the wireless nodes transmitting the topology broadcast message and network addresses of other nodes contained in the topology broadcast messages'**

This means-plus-function limitation recites two functions (means to "analyze" <u>and</u> "enter") is indefinite for lacking corresponding structure for either function. Netgear contends that a CPU is sufficient structure (D.I. 112 at 8) even though the Federal Circuit has unequivocally held that computing functions such as this one require the disclosure of an algorithm and not just a CPU. *Noah Sys.,* 675 F.3d at 1312; see also *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("It is only in the ***rare circumstances*** where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.") (emphasis added). The '531 Patent suggests that the 'analyze and enter' functions are carried out by software. ('531 at 12:35-37, noting a "topology table update routine 855 for constructing the topology table 823 for overheard topology broadcasts"). But as Ruckus's expert observed, the specification does not describe an algorithm associated with such software. (Ex. A at ¶ 59, Mohapatra Rep.) "Simply disclosing software, [] 'without providing some detail about the means to accomplish the function, is not enough.'" *Noah Sys., Inc.*, 675 F.3d at 1312 (quoting *Finisar Corp. v. DirectV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)).

Netgear contends in the alternative that the '531 Patent discloses a CPU <u>and</u> an algorithm that "update[s] the topology table to include the address of the wireless node transmitting a topology broadcast and the addresses of other wireless nodes contained in the topology broadcast message and equivalents thereof." (D.I. 112 at 8.) Netgear's proposed "algorithm" is no

algorithm at all. It merely parrots the "enter" function of claim 6, and thus provides no guidance as to how that function is to be carried out. See *Blackboard, Inc. v. Desire2Learn, Inc.*, 564 F.3d 1371, 1384 (Fed. Cir. 2009) (finding claim indefinite where the specification simply described a function without explaining how it was to be performed); *Selex Comm., Inc. v. Google Inc.*, 2013 WL 1412334, *5 (N.D. Ga. Apr. 8, 2013) (holding claim indefinite because disclosures that "simply restate the function . . . are insufficient to disclose an algorithm). Netgear's proposed "algorithm" is also silent with respect to any steps associated with the second, "analyze" function of claim 6. *Aoyama*, 656 F.3d at 1296-97 ("The court **must** construe the function of a means-plus-function limitation to include the limitations contained in the claim language"). "Means to analyze and enter" lacks corresponding structure rendering claim 6 invalid.

> **b.** **'means for analyzing the topology table or broadcast messages received at said internetworking node to determine if a sending wireless node is to be registered or not registered to said internetworking node'**

This means-plus-function limitation is also indefinite for lack of corresponding structure. As with the prior means-plus-function limitation, Netgear contends that a CPU is sufficient structure. (D.I. 112 at 8.)  A CPU alone is insufficient; an algorithm executed by that CPU must also be disclosed. *Noah Sys., Inc.*, 675 F.3d at 1312. The '531 Patent mentions that the function of "analyzing the topology table or broadcast messages received" is carried out by a "registration routine." ('531 at 12:37-40.) But as keenly observed by Ruckus's expert, the specification provides no additional guidance as to the specific algorithm or programming steps carried out by this so-called registration routine. (Ex. A at at ¶ 61, Mohapatra Rep.) The specification provides a generic disclosure of criteria the registration routine considers when making registration decisions ('531 at 9:25-29; 12:37-40.) The disclosure of criteria alone, however, does not amount to the requisite disclosure of an algorithm. See *Typhoon Touch Tech., Inc. v. Dell, Inc.*, 659 F.3d

1376, 1384-85 (Fed. Cir. 2011) ("the preferred definition of 'algorithm' in the computer art is: A fixed **step-by-step procedure** for accomplishing a given result") (emphasis added.) "Means for analyzing" renders claim 6 invalid for a lack of corresponding structure.

### B.   The '480 Patent

#### 1.   Background of the '480 Patent

The '480 Patent describes an RF data transmission system that utilizes a variety of diversity techniques to mitigate interference. By the '480 Patent's own admission, prior art RF data transmission systems had already been making use of diversity techniques ('480 at 2:1-4.) Such prior art systems, however, used diversity techniques on just one side of an RF data link: at the base station or hub (*Id.* at 2:9-12.) The '480 Patent purports to improve upon prior art systems by including diversity techniques on ***the other side the RF data link***: at subscriber stations (*Id.* at 2:39-42.) Netgear accuses Ruckus of infringing claims 1 and 12 (among others) of the '480 Patent. The claims recite monitoring radio frequencies for "optimal conditions" for RF data transmissions and then changing or selecting a particular antenna beam and/or polarization angle in response to such "optimal conditions."

#### 2.   Claims 1 and 12 of the '480 Patent are Invalid Because 'Optimal Conditions' Lacks Discernible Meaning

As set forth in the Joint Claim Construction Statement (D.I. 112), the parties construe the term 'optimal conditions' as follows:

| Claim # | Netgear's Proposed Construction | Ruckus's Proposed Construction |
|---------|--------------------------------|-------------------------------|
| 1. | most desirable conditions available for a subscriber station transmitter to transmit data wirelessly | indefinite and incapable of construction subject to 35 U.S.C. § 112, ¶ 2 (e.g., what is optimal?) |
| 12. | most desirable conditions available for wireless data transmissions from a transmitting device | indefinite and incapable of construction subject to 35 U.S.C. § 112, ¶ 2 (e.g., what is optimal?) |

The claim term "optimal conditions" is indefinite because any conceivable definition for that term—even Netgear's—would depend solely on the ***subjective views of an unknown and unidentified user***. As explained by one of Ruckus's experts, "[a] person of ordinary skill in the art would appreciate that what makes a particular condition "optimal" for wireless transmissions depends on the objective of the overall communication system." (Ex. B at ¶ 379, Stutzman Rep.) Another Ruckus expert explained that an RF data transmission system could be designed to "improve reliability or increase throughput or some combination of the two." (Ex. C at 115:20-21, Sabharwal Dep.) Thus, if the objective is to increase reliability of transmissions (*i.e.*, increase the number of bits received without error), a user may choose to transmit data using every available antenna (*Id.* at 116:18-20.) Alternatively, a user could partition antennas such that "[a] subset is used to increase reliability, and [another] subset -- [the] other remaining [antennas] are used to somehow increase throughput." (*Id.* at 116:20-23.) There is no definitive or otherwise unambiguous measure of how optimization might be achieved or what constitutes optimization to any particular user of the system; it varies by needs and demands of both system *and* user.

Netgear's proffered expert agrees that the objectives of an RF data transmission system may vary, for example, by seeking improved reliability or improved speed or some combination of the two (D.I. 113, Ex. A at ¶ 34.) Netgear's expert also admits that improvements in one aspect of RF data transmission systems do not necessarily lead to improvements in other aspects. (Ex. D at 408:10-16, Saunders Dep., "Q. You can have a reliable connection that's very slow, could you not? A. That is true. Q. And you can have a very fast connection that's very unreliable. Is that also true? A. That is also true.") Qualities such as transmission speed and reliability are also imprecise as there are a number of different parameters for measuring those qualities. (See Ex. E at 315:22-316:7, Stutzman Depo., "Q. So if you were skilled in something like polarization

11

diversity techniques in a wireless transmission system, you could implement a system that says I'd like to get a certain level of speed or reliability or a combination of that . . . that's something you could do, right? . . . A. Let me just say there's many parameters associated with something like that, error rate, capacity, interference rejection.") Whether a system is "optimal" depends on how a user desires to balance the parameters for measuring the system's performance. (*Id.* at 316:7-15, "And you have all the parameters that are measures of each one of those quantities, and **optimality** would be how do you balance that.") (emphasis added.)

In this way, "optimal conditions" is similar to the term "optimization," which was held indefinite in *Data Retrieval Technology, LLC v. Sybase, Inc.*, Case No. 08-CV-5481 (N.D. Cal., Nov. 8, 2010). The plaintiff in *Data Retrieval Technology* asserted that a database was "optimized" when "its performance with respect to a given characteristic is superior to that of the data source from which it was created." *Id.* at 9. The problem with that proposed construction, however, was that it did not identify the characteristic that was to be optimized even though a database's performance could be measured against multiple characteristics. *Id.* 9-10. As here, "optimization" of a database was found to involve trade-offs, resulting in inferior performance with respect to one or more characteristics and superior performance with respect to others. *Id.* at 10. A competitor would thus have "**no way to know whether a process for transforming a data source into a new database led to 'optimization**.'" *Id.* (emphasis added).

The fact that Netgear has proposed a definition for "optimal conditions" does not rescue the term from being indefinite. See *Halliburton*, 514 F.3d at 1251 ("Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."). Netgear merely swaps one subjective term ("optimal") for another ("most desirable"). The construction also

offers no definition of "conditions" even though such conditions and what ultimately makes them optimal for RF data transmission could vary greatly, depending on the user's objective and the balance of parameters for measuring the system's performance in view of such objectives.

Nor does the specification of the '480 Patent provide any direction as to the metes and bounds of the term "optimal conditions." For example, the specification refers to "the optimal antenna beam," "optimal hub," "which polarization is optimal," "which path is optimal," "optimal subscriber transmission frequency," "optimal subscriber transmission polarity," and "optimal subscriber receive polarity." ('480 at 4:18, 5:10, 33-34, 40, 6:35, 41, 43.) But no "yardstick" is provided for measuring a hub or the polarization, path, or frequency of wireless transmissions for optimality. *Girafa.com, Inc. v. IAC Search & Media, Inc.,* 2009 WL 30747121, at *2 (D. Del. Sep. 25, 2009) (finding claims invalid where there was no "yardstick" or "objective anchor" against which potential infringers may measure their activities). Indeed, Netgear's proffered expert, after offering up an alleged embodiment of claims 1 and 12, could not identify the optimal polarization. Optimality was said to <u>depend on the metric chosen</u> to monitor the wireless transmissions of that embodiment:

> [Witness:] And the '480 gives . . . one example of selecting between polarizations that have the highest signal level . . . It says "Receiving those two polarization," these two different polarizations, "allows subscriber radio 117 to select between the polarization that has the highest signal level and/or the most suitable signal attributes at any particular time."
>
> Q. So which of those two is optimal?
>
> A. . . . [H]aving chosen a quantity to monitor for optimal conditions, the - the - the RF data transmission frequencies having a plurality of polarizations are selected **according to the value of the metric selected**.

(Ex. D at 406:12-407:16, Saunders Depo.) (emphasis added)

Bereft of any direction from the specification, Ruckus's experts, who themselves are persons having at least ordinary skill in the art, had no choice but to opine that 'optimal conditions' is vague and ambiguous. (Ex. B at ¶ 376, Stutzman Rep., "I do not believe that claims 1 and 12 of the '480 Patent, and specifically the term 'optimal conditions,' have a meaning discernible to one of ordinary skill in the art."); (Ex. F at ¶ 166, Sabharwal Rep., "It is my opinion that the claim term "optimal conditions" is indefinite and ambiguous."). There is no standard for determining whether an RF data transmission system is operating in accordance with the 'optimal conditions' recited in claims 1 and 12. Such claims do not provide the public with adequate notice of its scope and are therefore indefinite. *Datamize*, 417 F.3d at 1350-52.

### 3.  Claim 12 of the '480 Patent is Indefinite Under §112, ¶6

> **a.      'means for monitoring RF data transmission frequencies, having a plurality of polarizations, for optimal conditions for said RF data transmissions'**

This means-plus-function limitation is indefinite for lack of corresponding structure. Netgear contends that sufficient structure is disclosed in the form of "one or more wireless transceivers." (D.I. 112 at 2.) The recited function of "monitoring RF data transmission frequencies" is, however, a specialized computing function and thus requires the disclosure of an <u>algorithm</u> for carrying out that function. *Noah Sys.,* 675 F.3d at 1312; see also *Selex Comm., Inc.*, 2013 WL 1412334 at *6  (finding "means for monitoring a telephone number dialed by a user" indefinite for lack of a corresponding algorithm).

The only references in the '480 Patent to the 'monitoring' of RF data transmission frequencies describe it as taking place at a "hub." (Abstract; Fig. 4; '480 at 2:50-53, 6:33-49.) Such disclosures are insufficient. Looking to Figure 4 as but one example, it identifies a plurality of hubs, which, at box 402, perform the function of "monitor[ing] BER of RF data transmissions

and/or signal levels on available frequencies and/or polarizations." This is nothing more than a restatement of the "monitoring RF data transmission frequencies" function of claim 12 and is insufficient to disclose an algorithm. See *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518 (Fed. Cir. 2012) (holding that, within a figure, the "black box" that represented the purchase-order-generation function by simply stating "purchase orders" did not describe the structure for carrying out that function); *Selex Comm., Inc.*, 2013 WL 1412334 at *5 (holding that a figure with boxes stating "capture # dialed" and "evaluate telephone number dialed" were nothing more than "black boxes" that restated the function of monitoring a telephone number dialed by a user and were thus insufficient to disclose an algorithm). Ruckus's expert concurred that the '480 Patent fails to disclose any algorithm for performing the function monitoring RF data transmission frequencies. (Ex. B at ¶ 392, Stutzman Rep.) Claim 12 is thus invalid.

> **b.      'means, responsive to said conditions, for selecting at least one of said beams having one of said orthogonal polarizations for data transmissions from said first transmitter'**

This means-plus-function limitation also recites a specialized computing function (i.e., selecting one antenna beam from a plurality of angularly diverse antenna beams having a particular polarization in response to so-called "optimal conditions"). The '480 Patent must disclose an algorithm for carrying out that function. *Noah Sys.*, 675 F.3d at 1312. Netgear contends that "one or more switches and equivalents thereof" is sufficient structure (D.I. 112 at 3.) The switches of the '480 Patent are nothing more than dumb binary mechanisms for feeding a signal from one component of a radio to another component. For example, the '480 Patent specification teaches that a received "polarization diverse antenna beam pair . . . may be fed into [a subscriber radio's inputs] through switches 114H and 114V." ('480 at 4:34-40.) The switches are not described as executing any programming steps for selecting an "optimal" antenna beam.

According to this "feeding" process, no one antenna beam is even singled out by the switches.

A switch may also "direct[] a transmitted signal to either duplexer 115H or duplexer 115V." ('480 at 5:29-34.)  This direction step is said to "depend[] on which polarization is optimal for transmission to the hub *as determined by the hub*." (*Id.* at 5:33-34) (emphasis added). But the specification does not describe how any such determination is communicated from the hub to the switch such that the switch could then carry out the decision making process of selecting the one "optimal" antenna beam.  The specification does not describe any algorithm executed by a switch for carrying out this selection process. (Ex. B at ¶ 392, Stutzman Rep.) What is more, the teachings referenced above concern only the "optimal" <u>polarization</u> for transmission.  The specification is silent as to any structure that performs the other part of claim 12's selection process: selecting one antenna beam having the "optimal" <u>angle</u> for transmission. Such lack of corresponding structure renders claim 12 invalid.

### C.   <u>The '143 Patent</u>

#### 1.      Background of the '143 Patent

The '143 Patent generally concerns mitigation of interference through gain control. Prior art gain control circuits were well known at the time of filing of the '143 Patent; for example, the '143 Patent notes that "Automatic Gain Control (AGC) is used in virtually all radio receivers." ('143 at 1:15-16.) Further, the '143 Patent admits to the existence of "prior art AGC" and "prior art interference mitigation." ('143 at 1:24, 2:65-66.)

As Netgear's own expert stated, "[r]adio waves are a form of electromagnetic wave which can propagate through space in accordance with **known physical laws** which govern their properties." (Ex. G at p. 7, Saunders report.) Further, "it's been **well known** in wireless communication systems for longer than a century that wireless systems are subject to

interference, and that that interference is usually undesirable, and it's therefore something whose effects one would wish to mitigate." (Ex. D at 276:6-11, Saunders Depo.) "Interference mitigation is a **common** problem in wireless communication and interference mitigation techniques are **widely deployed** in wireless communication systems." (Ex. G at p. 51, Saunders Report.) Netgear's expert further noted "a problem with communications systems subject to periodic interference, such as **commonly encountered** in unlicensed RF bands." *Id*. at 69. Specifically, "a **common** need for gain . . . would increase the size of the signal, power, current, voltage terms, for example to a level . . . to allow the receiver to decode, demodulate, detect the signals." (Ex. D at 22:1-15, Saunders Depo.) Interference mitigation, and specifically interference mitigation based on gain as controlled by gain control circuits, is well-known and deemed "common" in the art, even by Netgear's own expert.

### 2. Asserted Claims of the '143 Patent Lack Patentable Subject Matter Under §101

Against this background, claim 13 of the '143 Patent purports to improve upon prior art gain-based interference mitigation by adding a data-gathering step and a step for applying the gathered data to prior art gain control processes. (See '143 at 6:27-31.) Claim 13, however, lacks patentable subject matter when considered in light of the analytical framework laid out in *Bilski* and *Mayo*. Dependent claims 14-19 fail to recite any subject matter would independently confer patent-eligibility.

### a. Machine-or-Transformation Test

The asserted claims of the '143 Patent are all method claims that should be analyzed in light of the machine-or-transformation test. To meet either prong of the machine-or-transformation test to be met, a method claim must recite a machine or a transformation that is integral to the claimed invention, "facilitating the process in a way that a person making

calculations or computations could not." *SiRF Technology*, 601 F.3d at 1332. A machine is "'a concrete thing, consisting of parts, or of certain devices and combination of devices," while a transformation results in " a different state or thing." *Id*; *Mayo Collaborative*, 132 S.Ct. at 1302. Nothing recited in the asserted claims of the '143 Patent meets either standard.

The preamble of independent claim 13 identifies nothing more than a particular field-of-use, which does not confer patentable subject matter to a claim. *Mayo Collaborative*, 132 S.Ct. at 1301 ("[L]imiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable"). The preamble presents an interesting dilemma for Netgear as its counsel argues that preamble terms of claim 13 are not limitations with respect to claim construction, while its expert relies upon the same to argue that patent-eligible subject matter is present in the claimed invention. (D.I. 112 at 13, n.3 (contending the preamble is not a limitation); *contra* Ex. H at 98, Saunders Rebuttal (contending that the method of claim 13 concerns operation of a circuit)).

With respect to the construction of 'operating a gain control circuit,' Netgear explicitly admits that "[t]here is no dispute over the word 'operating'" and also cites to the teaching that "[s]ystem operators are free to operate wireless equipment." (D.I. 113 at 18, citing '143 at 2:13-15). This is consistent with the testimony of Netgear's expert in discussing mitigation of interference: "The operator is responsible for creating a system that has acceptable levels of background interference." (Ex. D at 279:15-17, Saunders Depo.) But Netgear's citation to "[s]ystem operators are free to operate wireless equipment" indicates that ***human*** operators are the ones doing the 'operating' and that the equipment (*e.g.*, 'gain control circuit') is merely a passive object being acted upon. The role of the 'gain control circuit' is therefore incidental. Such incidental use fails to "impose a sufficiently meaningful limit on the claim's scope" and as

such, "does not make the otherwise unpatentable method patent-eligible under §101." *CyberSource*, 654 F.3d at 1375. As such, the reference to 'gain control circuit' in the preamble fails to meet the requirements of the machine prong of the machine-or-transformation test.

The first step ('gathering statistical information') of claim 13 is equally silent regarding anything that could be construed as a machine or a transformation. As such, this first step fails to meet either the machine or the transformation prong of the machine-or-transformation test.

The second step ('directing receiver gain') likewise fails to recite a machine that is integral to the claimed invention. For example, it is undisputed that 'gain' itself is **not** a machine. While Netgear's expert offers that a receiver is a machine, it is also undisputed that 'gain' is a "level" located "in" the receiver. (Ex. H at p. 98, Saunders Rebuttal; D.I. 124 at 9, Netgear admitting that "gain refers to a level **in** the gain control circuit" and "Dr. Saunders testified that receiver gain is a level **in** the AGC of a receiver.") In that regard, the step of 'directing' is applied to the gain level, and that the reference to 'receiver' merely specifies where the gain level is located.[1] As such, the tie to a receiver is insufficient to meet the machine prong of the machine-or-transformation test.

Moreover, 'directing receiver gain' only requires that a direction be given regarding gain located in a receiver. There is no requirement that any direction actually be carried out. In that regard, Netgear fails to identify anything in the claim that would bar a human operator from providing the claimed direction regarding receiver gain to the gain control circuit. In such an instance, the role of the gain control circuit is merely that of a recipient of the direction. Such a

---

[1] In this regard, claim 13 as originally filed recited '**directing the gain** of said gain control circuit.' (D.I. 115 at A-1126.) The reference to 'receiver' was introduced in the amendment submitted on March 27, 2006 to distinguish the claims from the cited prior art, which were admitted to teach adjusting gain parameters in transmitters. (D.I. 115 at A-1289.) As 'receiver' merely serves as a location of the 'gain,' the step of 'directing receiver gain' does not require the receiver to actually do anything.

role is neither "integral" nor does it play a "significant" part in allowing the method to be performed. As such, the purported 'tie' to a gain control circuit is insufficient to meet the machine prong of the machine-or-transformation test.

Netgear's expert argues with respect to the transformation prong: "the gain control circuit of the RF receiver will be transformed into a different state after performing these steps because the gain of the receiver will be changed from time to time." (Ex. H at p. 98, Saunders Rebuttal.) There are no limitations, however, in claim 13 that requires the gain control circuit to actually follow the direction or for gain to actually change. The claimed 'directing' only requires that a direction be given and no more. Furthermore, dependent claims 18 and 19 ***explicitly*** recite that the claimed 'directing step further includes . . . directing said gain to hold gain levels, ignoring said interference.' ('143 at 7:44-45, 57-58.) It is therefore undisputed that the claimed 'directing' step can therefore be performed without resulting in **any** change in gain.

Netgear's expert next argues that where "the gain can be held constant . . . this in fact transforms the state of the apparatus such that gain will remain constant where it would otherwise have varied." (Ex. H at p. 98, Saunders Rebuttal.) But the transformation prong requires that the method result in an actual "different state or thing." *SiRF Technology*, 601 F.3d at 1332. Dr. Saunders' admission that gain level can "remain constant" subsequent to 'directing' confirms that there is no "different state or thing" as required by the transformation prong.

Netgear cannot have it both ways in arguing that a transformation occurs when gain is changed <u>and</u> when gain remains constant. (Ex. H at p. 98, Saunders Rebuttal, stating that "while holding gain levels constant is one possible response to achieve the desired result, there are other transformations for the gain control circuit to also provide.") Such an interpretation would not only eviscerate all meaning from "transformation," but also relies on flawed logic. A gain control

20

circuit controls the change in gain. As such, the instances where gain "would otherwise have varied" are instances when the gain control circuit acts to raise or lower gain level. By Netgear's logic, a **failure** to act would result in a transformation, because actually performing the act would have otherwise resulted in a change. That cannot be the standard for the transformation prong of the machine-or-transformation test.

Moreover, the transformation prong is not met where a step could conceivably be accomplished without any transformation. *Mayo Collaborative*, 132 S.Ct. at 1303 (finding no transformation where a "step could be satisfied without transforming"). Not only is it admittedly possible to perform the claimed 'directing' step without any transformation, dependent claims 18 and 19 explicitly *require* no change. Because the claimed 'directing' can result in no change -- a result which can also be achieved by omitting the claimed 'directing' step altogether -- such claimed 'directing' fails to confer patent-eligible subject matter to claim 13 of the '143 Patent.

### b.     Abstract Ideas and Other Patent-Ineligible Limitations

The first step of claim 13 ('gathering statistical information') literally recites mere data gathering, which the Federal Circuit has repeatedly held to be insignificant extrasolution activity and therefore insufficient to confer patent-eligible subject matter, regardless of how the data is gathered. *E.g., CyberSource*, 654 F.3d at 1370. And the particular data being gathered pertains to manifestations of the laws of physics with respect to interference and signals, which are transitory and unpatentable. *In re Nuijten*, 500 F.3d 1348, 1354 (Fed Cir. 2007) (holding that "[p]hysical but transitory forms of signal transmission such as radio broadcasts, electrical signals through a wire, and light pulses through a fiber-optic cable" are not directed to patent-eligible subject matter).

Claim 13 also relies on language that is so "highly general" as to encompass all possible "known and unknown uses" for applying the gathered statistical information. *Mayo*, 132 S.Ct. at 1301. Abstract subject matter does not become patent-eligible by the mere addition of the instruction "apply it." *Id*. at 1294 (holding "one must do more than simply state the law of nature while adding the words 'apply it'"). "[S]imply implementing a mathematical principle on a physical machine, namely a computer, was not a patentable application of that principle." *Id*. at 1301. Claim 13 merely recites the gathering of data regarding physical phenomena associated with signal interference and adding the instruction to apply it somehow within a well-known infrastructure.

Nor is there anything in dependent claims 14-19 that might independently confer patent-eligible subject matter. For example, claim 15 additionally recites "receiving said interference on an antenna." Receiving interference on an antenna is, however, a well-understood routine and an otherwise conventional step in the art, which thus fails to confer patent-eligible subject matter to claim 15. Claims 14 and 16-19 likewise fail to recite anything that might confer patent-eligible subject matter, thereby rendering those claims invalid for lack of patentable subject matter.

### 3.    Asserted Claims of the '143 Patent Lack Written Description Support Under Section 112, Paragraph 1

The original claims of the '143 Patent did not recite 'receiver gain,' and as such, cannot provide its own written description. The limitation of "receiver gain" was introduced in an amendment during prosecution, wherein the applicants argued that the claimed "receiver gain" was novel over the cited prior art reference to Fullerton, which taught "mitigating interference" by "using interference indications to determine predicted noise periods" and "conveying the message at a higher power during noise periods." (D.I. 114 at A-1289, 1295.) The applicants argued that "Fullerton discloses adjusting only transmitter power levels." *Id*. at A-1295. But

there is no written description in the specification of the '143 Patent for the claimed 'receiver gain' that is distinct from transmitter gain. The specification and asserted claims make repeated references to gain in contexts that include transmission:

- "The present invention is directed to a system and method which statistically determines when regularly occurring interference events of a predictable duration will occur, for example radar pulses and dynamically adjusts an automatic gain control (AGC) for RF **data transmissions** accordingly." ('143 at Abstract.)
- "The present invention relates to communications interference detection and mitigation systems and more particularly to a system and method for directing automatic gain control for **RF data transmissions** in response to tabulated interference statistics." ('143 at 1:6-10.)
- "The present invention is used to detect interference and mitigate its effect on **data transmission** in unlicensed RF bands employing a method and system for a statistically directed automatic gain control 100 (AGC)." ('143 at 4:24-27.)
- "subscriber unit can perform the same type of RF detection and responses for **data transmissions** as the hub to avoid interference." ('143 at 4:64-67.)
- "19. The method of claim 13 wherein said **directing** [receiver gain] step further includes . . . scheduling **RF transmissions** to avoid said interference; changing an RF frequency of **transmissions**; changing antenna polarity of RF **transmissions**; performing waveform subtraction of said interference; equalizing multipath events of an **RF transmission**; and increasing forward error correction of a **transmission**." ('143:7:54-8:5.)

Notwithstanding, a person having ordinary skill in the art would understand that "[m]ost antennas are reciprocal devices and behave the same on transmit as on receive." (Ex. I at 102, Stutzman Reply.) Further, antennas used in communication applications are reciprocal -- the gain of an antenna when receiving is the same gain when transmitting. Given the paucity of disclosure specifically regarding receivers and the lack of any disclosure specifically regarding 'receiver gain,' the specification of the '143 Patent fails to apprise persons of skill in the art to specifically identify "receiver gain" as a novel feature distinct from transmitter gain and in possession of the inventors of the '143 Patent.

23

### 4.      Asserted Claims of the '143 Patent are Indefinite Under §112, ¶2

#### a.      'mitigate'

Whereas claim 13 recites "directing receiver gain . . . to mitigate effects of said interference," dependent claims 18 and 19 of the '143 Patent each recite that the directing step of claim 13 "further includes . . . directing said gain levels to hold, ignoring said interference." ('143 at 7:29-58.) Because claims 18 and 19 are dependent on claim 13, they incorporate all the limitations recited therein. It is insolubly ambiguous how 'directing receiver gain . . . to mitigate the effects of said interference' can be accomplished by 'ignoring said interference.'

Netgear's expert argues that ignoring interference may result in losing fewer bits in instances where responding to interference would exacerbate bit loss. (Ex. H at p. 298, Saunders Rebuttal.) In such circumstances, however, ignoring the interference only prevents the system from causing bit loss to be **worse**. In that regard, the exact same amount of bit loss occurs as would if the claimed "directing" were not performed at all. Refraining from making bit loss worse is not the same as actually mitigating bit loss. Netgear's construction for "mitigate effects" of interference requires that the claimed "directing" step "**reduce** effects of said interference." (Ex. H at p. 15, Saunders Rebuttal.) Netgear's own expert confirmed that ignoring the interference still "can allow for bits to be lost." (*Id*. at p. 298, Saunders Rebuttal.) As such, 'mitigate effects' is indefinite even under NETGEAR's proposed construction as it cannot be determined how the effects of interference are mitigated or reduced in any way by 'ignoring said interference.'

### b.    'directing receiver gain'

As noted above, claim 13 recites 'directing receiver gain.' ('143 at 7:29.) Dependent

claim 19 of the '143 Patent further specifies, however, that 'said **directing step further includes**

at least one step from a group of steps consisting of:

1.    'directing said gain to hold gain levels, ignoring said interference'
2.    'directing said gain to raise gain level prior to onset of said interference'
3.    'directing said gain to lower gain level prior to onset of said interference'
4.    'directing said gain to raise gain levels at cessation of said interference'
5.    'directing said gain to lower gain levels at cessation of said interference'
6.    'scheduling RF transmissions to avoid said interference'
7.    'changing an RF frequency of transmissions'
8.    'changing antenna polarity of RF transmissions'
9.    'performing waveform subtraction of said interference'
10.   'equalizing multipath events of an RF transmission;'
11.   'increasing forward error correction of a transmission.'

('143 at 7:55-8:5.) Because claim 19 is dependent on claim 13, it incorporates all the limitations

recited therein. It is insolubly ambiguous how 'directing **receiver gain**' can be applied to steps

such as 'scheduling RF transmissions,' 'changing antenna polarity,' or the other recited steps that

have nothing to do with either receivers or gain.

### D.    The '454 Patent

#### 1.    Background of the '454 Patent

The '454 Patent is riddled with typographical errors and unintelligible references. The

claims employ language found nowhere in the specification or prosecution history. In reviewing

the prosecution history for the application that became the '454 Patent, it becomes apparent how

such a shoddy patent was issued – the examiner did not issue a *single* office action. The patent

thus issued replete with errors. Given the lack of scrutiny, it is easy to understand how the claims

are indefinite and otherwise invalid.

### 2.    Claims 1 is Invalid Because 'Relative Transmission Rate' is Indefinite for Lack of Discernible Meaning

Claim 1 of the '454 Patent recites a method comprising the step of "discerning a relative transmission rate." ('454 at 8:58-64.) The '454 Patent fails to define that limitation. The term 'relative' does not even appear in the specification of the '454 Patent. As Ruckus's expert, Dr. Stutzman, explained, 'relative transmission rate' does not have a commonly understood meaning to those of ordinary skill in the art. (Ex. B at ¶ 210, Stutzman Rep.) Nor was Dr. Stutzman able to discern any meaning despite closely reviewing the '454 Patent's specification. (*Id.* ¶ 210.) As Dr. Stutzman further noted, "one of ordinary skill in the art -- as did I -- would naturally ask the question: 'relative to *what*?'" (*Id.*) Because one having ordinary skill in the art would not understand the scope of this claim limitation, it is invalid. *Allen Eng'g Corp v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002) (patent claims are invalid if those of ordinary skill in the art would not understand what the inventor regarded as his invention).

Netgear and its expert attempt to redefine this limitation by arguing that "discerning a *relative* transmission rate" means "determining an *available* transmission rate." (Ex. G at 24, Saunders Rep.) But as the Federal Circuit has directed, courts must begin the claim construction analysis with the words of the claim, giving the words "their ordinary and customary meaning." *See Phillips,* 415 F.3d at 1312–13. This is the meaning that a "term would have to a person of ordinary skill in the art in question at the time of the invention" in view of the intrinsic record. *Id*. **'Relative'** and **'available'** are two **very different** things, and the specification does not define (or redefine) 'relative transmission rate.' As such, the term 'relative' is indefinite. *Altiris,* 318 F.3d at 1375-76 ("claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from [that meaning]") (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

Netgear's expert points to FIGs 4A and 4B of the '454 Patent to support Netgear's argument that 'relative' means 'available.' (Ex. G at 52-53, Saunders Rep.) The aforementioned figures are flow charts purporting to diagram the claimed method. ('454 at 5:34-39.) But neither flowchart discloses the act of discerning a relative transmission rate. (*Id.*) Dr. Saunders also points to portions of the '454 Patent that provide additional detail as to FIGs 4A and 4B. (Ex. G at 53, Saunders Rep.) But this additional disclosure merely discusses monitoring a subscriber transmission rate and determining if that rate is 'optimal.' There is no discussion of 'discerning a relative transmission rate' as recited in claim 1.[2]

Netgear's expert also testified regarding his interpretation of the patent claim:

> And [the '454 Patent] goes on to say "If the transmission rate is optimal, then the uniform coverage antenna pattern is maintained." So its reference to "optimal" makes clear that it is discerning one rate relative to another, discerning the -- the optimum rate relative to other rates.

(Ex. D at 382:20-383:1, Saunders Depo.) Dr. Saunders then elaborated on the term "optimal":

> In Netgear's construction is a construction of optimal conditions and it says "most desirable conditions available for a subscriber station transmitter to transmit data wirelessly. . . ." *I believe in the context of this invention that optimal means -- means a -- a most desirable configuration* . . . . there are a number of different parameters that can be optimized, and I have listed those parameters to you, because those parameters are all symptoms of interference. So *for different systems and in different modes the wireless engineer, one skilled in the art might choose different of those parameters* . . . .

(*Id.* at 385:8-386:24.) First, Dr. Saunders testimony demonstrates that the claim term might employ different parameters "for different systems and in different modes." Such variable

---

[2] The specification of the '454 Patent also fails to provide any written description or any other enabling disclosure of any apparatus or structure capable of "discerning" a transmission rate to and from at least one subscriber of said data transmission. For this additional reason, claims 1 and 14 are invalid for lack of written description support. *MagSil Corp. v. Hitachi Global Storage Technologies, Inc*., 687 F.3d 1377, 1381-82, 84 (Fed. Cir. 2012) (affirming summary judgment where patent failed to enable persons of ordinary skill in the art to practice the claimed invention).

meaning renders the claim indefinite. *Halliburton*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite.").

Second, when words of degree such as "relative," "optimal," and "most desirable" are used in a patent claim, the patent must provide some objective standard or "yardstick" for measuring that degree. *Datamize,* 417 F.3d at 1351 (finding "aesthetically pleasing" indefinite despite plaintiff's expert opinion that one of ordinary skill in the art would understand it). The '454 patent claims discerning a 'relative' transmission rate, but fails to answer the question: *relative to what*? Dr. Saunders' opinion that 'relative' means 'available,' which in turn depends on 'optimal' or 'most desirable,' does nothing to define the scope of the term; if anything, it renders the term even *more* subjective. (Exhibit J, *Data Retrieval*, No. 08-05481 at 5-11) (granting summary judgment of invalidity for indefiniteness where the patent failed to provide any meaningful way to know when the claim term "optimization" would be satisfied). The claim is thus fatally indefinite. *Id.;see also Halliburton*, 514 F.3d at 1251 ("Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope); *Girafa,* 2009 WL 30747121 at *2 (finding claims invalid where there was no "yardstick" or "objective anchor" against which potential infringers may measure their activities).

### 3.    The '454 Patent Fails to Enable Persons of Skill in the Art to Ascertain a Type of Interference

Claim 1 of the '454 Patent recites a method for mitigating the effects of interference, one step being "ascertaining a type of said interference." ('454 at 8:58-67.) As Ruckus's expert

opined, the '454 Patent does not enable a person of ordinary skill in the art to ascertain a type of interference. (Ex. B at ¶214, Stutzman Rep.) First, the '454 Patent fails to explain what <u>are</u> the 'types' of said interference that might be ascertained. As Dr. Stutzman explained, those of ordinary skill in the art would have understood that, at the time the application that became the '454 Patent was filed, there were numerous possible 'types' of interference. (*Id.*)

Second, even if the '454 had identified the 'types' of interference, the '454 Patent does not disclose how one of skill in the art might go about ascertaining them, and does not disclose any apparatus or structure capable of doing so. (*Id.* ¶ 215.) The patent laws require that the patent be sufficiently detailed to enable those skilled in the art to practice the invention. 35 U.S.C. § 112 ¶ 1. The purpose of this requirement is to ensure that the public, in exchange for the patent rights given to the inventor, obtains from the inventor a full disclosure of how to make and use the invention. *MagSil*, 687 F.3d at 1381-82, 84 (affirming summary judgment where patent failed to enable persons of ordinary skill in the art to practice the claimed invention). Because the '454 Patent fails to enable those of ordinary skill in the art to practice the claimed invention, the claim is invalid. *Id.*

### 4. Claims 2 and 16 are Invalid Because 'Narrow Antenna Beams' Lacks Discernible Meaning and Are Therefore Indefinite

How narrow is narrow? That is a key question that the '454 Patent fails to answer. Netgear argues that the term "narrow" does not mean narrow at all, but "focused on particular devices <u>regardless of the measured angle</u>." (D.I. 124 at 12)(emphasis added.) That construction flies in the face of the patent, which defines narrow antenna beams as "cover[ing] <u>less area</u> than a <u>wide</u> beam system." ('454 at 4:19-20). Thus, the <u>amount of area covered</u> is a critical aspect of 'narrow antenna beams' as claimed by the '454 Patent. No standard is provided by which to measure the scope of 'narrow' versus 'wide,' thereby failing to inform the public what is a

'narrow' antenna beam. Claims 2 and 16 are thus invalid. *Girafa,* 2009 WL 30747121 at *2;

*Allen Eng'g*, 299 F.3d at 1348 (patent claims are invalid if those of skill in the art would not

understand what the inventor regarded as his invention).

Even adopting Netgear's construction the public is left with no discernible definition.

Under Netgear's construction, antenna beams of <u>any width</u> can be directed to communicate with

a receiving device and thus "narrow." The '610 Patent which Netgear incorporates by reference

is equally ambiguous, defining 'narrow' beams as "more highly directional." ('610 at 6:60-31.)

Applying Netgear's construction, a **tenth-of-a-degree** beam and a beam measuring **180 degrees**

**or more** could both be "narrow antenna beams" depending on the environment. Netgear's expert

confirmed this ambiguity: "Q. How narrow is narrow? A. It depends . . . . <u>[I]t depends on the</u>

<u>environment and the system that you are working in</u> . . . . In some systems that could be one

degree, in others it could be 180 degrees or even more." (D.I. 117-3 at 293-94). Applying

Netgear's construction, the same beam could be deemed "narrow" or "wide" – and thus found to

infringe or not infringe – depending on the environment. That is the very definition of indefinite.

*Halliburton*, 514 F.3d at 1255 (Fed. Cir. 2008) ("When a proposed construction requires that an

artisan make a separate infringement determination for every set of circumstances in which the

composition may be used . . . that construction is likely to be indefinite.").

> **5.     Claim 14 is Indefinite Because the '454 Patent Fails to Define, and
> Recites No Corresponding Structure, for the 'Scanner' Limitation**

Claim 14 of the '454 Patent recites a "scanner determining a frequency, bandwidth and

any periodicity of said interference." ('454 at 10:14-15.) Netgear defines 'scanner' as an "RF

receiver capable of being used to determine a frequency, bandwidth, and any periodicity of said

interference in RF frequencies of interest." (D.I. 113 at 23.) Netgear cites the abstract in support,

which provides "a scanner determines the frequency, bandwidth and any periodicity of the

interference." ('454 Abstract) Like Netgear's construction, such teaching describes what a scanner *does* (*i.e.*, ***function***) not what a scanner *is* (*i.e.*, ***structure***). 'Scanner' is thus subject to § 112, ¶ 6. *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013) ("If . . . the claim term recites a function *without reciting sufficient structure* for performing that function . . . means-plus-function claiming applies.").

The '454 Patent fails to define the term 'scanner,' and the term had no recognized meaning to persons of ordinary skill in the art. (Ex. B at ¶ 231, Stutzman Rep.) Rather, those of skill in the art appreciate that there are *numerous* potential meanings of the term 'scanner." (*Id.*) Because it is subject to Section 112,¶ 6, and because there is no definite structure to perform the recited function, claim 14 is invalid. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002) (means plus function claims are invalid if the specification fails to clearly identify corresponding structure to perform the claimed function).[3]

### E.   The '035 Patent

#### 1.   Background of the '035 Patent

The '035 patent expressly admits the prior art teaches "a mobile/indoor cellular radio communication system" in which "a base station usually communicates with multiple mobile stations and functions as a bridge between mobiles and landline networks." ('035 at 1:16-19.) Admitted prior art also teaches "[a]ntenna diversity techniques" including "transmitting or receiving antenna diversity" where "[a]ntennas are switched." (*Id.* at 1:21-24, 43; 1:35-37 (based

---

[3] Netgear cited *Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 649 F.3d 1350 (Fed. Cir. 2011) in arguing that "Ruckus fails to rebut the presumption that this structural term [scanner] is not a means [plus function] term." (D.I. 124 at 12.) In *Inventio*, the Federal Circuit found that a claimed 'modernizing device' was not subject to §112 ¶ 6 because the specification depicted the device, its internal components (including processor, signal generator, converter, memory, and signal receiver elements), how the elements were connected, and how the device received signals, processed them, and controlled the system. (*Id.* at 1358-59.) The '454 Patent provides no such detail with regard to "scanner."

on such criteria as link quality, AGC levels, and errors); 1:31-33 (based on received signal strength); 1:44-47 (based on current signal strength falling below a threshold or on predetermined elapsed time); 1:53 (based on "random access schemes")).

Likewise, the applicants of the '035 Patent admit that prior art "Akaiwa patent does show the use of a storage medium to store information from the last reception to be used in the next transmission." (D.I. 114 at A-248.) The Examiner also issued various rejections because the prior art disclosed a diversity transmission system, wireless radio, base station, mobile station, multiple antennas, antenna switches, base and mobile station transceivers, means for determining a preferred antenna based on successful receipt of data, means for selecting a preferred antenna based on successful data receipt, a controller, means for controlling, antenna storage means, and means for changing the preferred base station antenna. (D.I. 114 at A-166-68, 285.) Such findings were never disputed by the applicants of the '035 Patent. (*Id.* at A-248-49.) Many limitations of the '035 Patent were thus undisputedly present in the prior art, thereby constituting "well-known, routine, conventional activity" insufficient to confer patent-eligible subject matter.

### 1.    Asserted Claims of the '035 Patent Lack Patentable Subject Matter Under §101

Against this background, the specification repeatedly states that "**the invention** is directed to a *strategy*." ('035 at 2:1); 2:66-3:1; 8:58, 63; Title ("Diversity transmission **strategy** in mobile/indoor radio communications") (emphasis added). When something "is described as **the invention itself**, the claims are not entitled to a broader scope." *Scimed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). A strategy is an abstract idea. *Bilski*, 130 S.Ct. at 3223 (describing strategy for hedging against risk). Likewise, the prosecution history reveals that in response to Examiner rejection, the applicants argued only:

[Cited prior art] does not teach the **use of random selection** of antennas in

> absence of the specific preferred antenna information. Nor does it teach, in combination with stored preferred antenna information and random antenna selection, switching antennas with each **retransmission** of unsuccessfully transmitted data **until there is a successful transmission** or there has been a **predetermined number of retransmissions**."

(D.I. 114 at A-248-49.) In that regard, the purportedly novel strategy of making random selections, making multiple attempts, and trying something different when a previous attempt is unsuccessful is comprised of abstract ideas. Further, in specifying such limitations that purportedly distinguish the invention over prior art in response to Examiner findings that all limitations were disclosed by prior art, the applicants implicitly admit that the other unspecified limitations lack such novelty. Because "well-understood, routine, conventional activity" cannot confer patentability, such patentability must come from the limitations purported by the applicants to "make[] this invention novel." *Mayo Collaborative*, 132 S.Ct. at 1294. As the purported points of novelty pertain to abstract strategies, however, they fail to confer patent-eligible subject matter to claim 1 of the '035 Patent.

Moreover, claim 1 of the '035 Patent is not necessarily limited to "random selection." Rather, the claim recites only selection 'in absence of said stored indicia.' Such means would encompass admitted prior art selection that are based on, *inter alia*, current signal strength falling below a threshold or a predetermined elapsed time. '035 at 1:43-47. To the extent that the asserted claims encompass "well-known, routine, conventional activity" such as that described in the admitted prior art, such activity does not confer patentable subject matter.

In addition, the specification provides that various claim limitations encompass signals, which are transitory subject matter and ineligible for patent protection. *Nuijten*, 500 F.3d at 1354. For example, the claimed 'means . . . for determining which one of said multiple antennas received data most successfully' corresponds to the teaching that "signals 22 and 23 from the base station,

33

transceivers 12 and 13, respectively, indicating their respective success in receiving packets."

('035 at 6:24-26.) Likewise, the claimed 'means . . . for selecting one of said multiple antennas . . .

based on its use to successfully receive data during the last reception' corresponds to the teaching

that "a signal on line 57 from the mobile station transceiver 4 indicating that the last packet

reception was a success." (*Id.* at 7:37-39.) Netgear's expert argues that such signals are "control

signals," but that is a distinction without a practical difference. (Ex. H at 300, Saunders Rebuttal.)

Control signals are encompassed by such claim limitations, which are therefore directed to

transitory, abstract, and ineligible subject matter.

There is also nothing in dependent claims 4 and 5 that might independently confer patent-

eligible subject matter. Claim 4 recites "means for measuring received signal strength." Yet

measuring signal strength was well-understood, routine, and conventional in the art, thereby

failing confer patent-eligibility. ('035 at 1:31-33.) Likewise, claim 5 recites "error correction

means" which Netgear purports to correspond to "code and checksums." (D.I. 124 at 15.) "Code

and checksums" are abstract, thereby failing to confer any patentable subject matter.

### 2.      Asserted Claims of the '035 Patent are Indefinite Under Section 112, Paragraph 2

'Most successfully' is a term of degree and therefore requires a standard for objective

measurement. Netgear construes this term to refer to "a preferred antenna determined based on

higher received signal energy and/or successful error checking and/or receipt (or lack of receipt)

of acknowledgement packets." (D.I. 112 at 15.) Notwithstanding Netgear's suggestion, "success"

in receptions is used in the specification only to refer to a state that is distinct from "higher signal

energy," "successful error checking," and "acknowledgements." Those are secondary

considerations separate and distinct from whether a successful reception occurred.

The specification teaches, for example, that "[i]f both [receptions] are successful, the

antenna with higher received signal energy becomes the preferred antenna." (*Id.* at 5:4-15.) Such usage indicates that 'success' is distinct from 'higher signal energy,' as an antenna may be successful yet not have the higher signal energy. Further, the specification states "the only indication of whether a packet has been more sucessfully [sic] received is determined" and the "means for this **indication** is the success or failure of the computation of an error-detecting code, or checksum." ('035 at 5:25-29.). An ***indication of success*** is not the same as ***the success itself***, which exists regardless of whether it is indicated. Moreover, success of error-detecting code or checksum does not necessarily indicate that a reception was "most successful." Likewise, an acknowledgement is another kind of indication regarding success, and mere receipt of an acknowledgement does not necessarily indicate the associated reception is "most successful."

In addition, new matter was improperly added to the specification to provide written description and clarity for the 'most successfully' limitation. The original and amended portions of the specification are provided as follows:

> **Original specification**: "the only indication of whether a packet has been successfully received is determined at the end of packet reception."

> **Amended specification**: "the only indication of whether a packet has been more successfully received is determined at the end of packet reception,"

(D.I. 114 at A-76.) The original specification merely refers to a successful packet reception. As amended, the specification would refer to a comparison in successes. As such, the meaning has been changed to incorporate a comparison into the specification. As the applicants of the '035 Patent were unsuccessful in overcoming an indefiniteness rejection based on 'most successfully,' they attempted to amend the specification again to provide additional support:

> Page 11, line 7, after the period "." add -- While in certain circumstances use of error correction or checksum schemes are preferable, either of those schemes or the measurement of received signal strength can be used to determine which antenna received "most successfully."

(*Id*. at A-268.) Notwithstanding entry, the Examiner expressly found that the claim term 'most successfully' was indefinite in light of the originally filed specification and only withdrew that indefiniteness rejection after submission of the aforementioned amendment. As there is no discernible meaning for 'successfully receive,' the asserted claims of the '035 Patent should be found invalid under Section 112 for indefiniteness, or in the alternative, for lack of written description to support the same.

### 3.     Asserted Claims of the '035 Patent are Indefinite Under §112, ¶6

#### a.     'means . . . for determining which one of said multiple antennas received data most successfully'

There is nothing in the language of the claims or the specification that clearly links any structure to any instance of the 'means . . . for determining,' which is clearly subject to Section 112, paragraph 6. The specification provides only:

> In the detailed description that follows, it is the case that the only indication of whether a packet has been more successfully received is determined at the end of packet reception. The preferred means for this indication is the success or failure of the computation of an error-detecting code, or checksum. In general, this is a powerful and effective **means of determining packet reception success**.

('035:5:24-30) (emphasis added). No algorithms were provided for the "error-detecting code or checksum." The specification also teaches that "[t]he signal indicates which, if any, of the transceivers 12 and 13 **successfully received** the packet" and that "**signals** 22 and 23 from the base station, transceivers 12 and 13, respectively, indicating their **respective success in receiving** packets." ('035 at 5:61-63, 6:24-26)(emphasis added). Likewise, the applicants stated during prosecution that the structure for 'means for determining' under §112, ¶ 6 is the "higher received data signal" or "error correction methods." (D.I. 114 at A-276 (stating that "in a number places [sic] the specification states that **higher received data signal** can be used to **determine**

**the more successful** of two antennas.")). Such intrinsic evidence indicates that 'means for determining' corresponds to "error-detecting code or checksum" or "signals," which lack supporting algorithms and therefore do not qualify as structure under §112, ¶ 6.

Likewise, FIG. 4 is "a flow chart of a stationary [base] station controller's actions." ('035 at 2:55-56.) Such actions do not include any determination. Instead, "[t]he base station controller 16 first examines the preferred base station transceiver table 30 at block 40." (*Id.* at 6:49-50.) As such, the determination of which antenna is preferred (so as to be included in the table) has already been made before the base station controller even performs its "first" action. It is thus evident that there is no disclosed structure in the '035 Patent clearly linked to the function of 'determining which one of said multiple antennas received data most successfully' as required by §112, ¶ 6.

> **b.** **'means . . . for selecting one of said multiple antennas in such mobile station as a preferred antenna . . . based on its use to successfully receive data during the last reception'**

The function for this 'means for' claim element refers to 'selecting . . . a preferred antenna . . . based on its use to successfully receive data during the last reception.' The claimed function must include selecting a preferred antenna based on use to successfully receive data. *Aoyama*, 656 F.3d at 1296 (function must be construed to include the limitations as recited). As such, Section 112, paragraph 6 requires a corresponding structure to be clearly linked to the specific function of 'selecting' a preferred antenna based on success. There is no disclosure that clearly links any structure to that function. Instead, the specification refers to various *different* types of antenna selection (*e.g.*, success, random selection). ('035 at 4:15-17, 35.)

For example, in describing FIG. 6 as "a flow chart which shows the actions of the mobile station controller," the specification states "[f]irst the preferred mobile station antenna register 58

is inspected." (*Id.* at 7:53-57.) As such, the selection of an antenna as preferred and thereafter included in the register has already been made when the mobile station controller performs its "first" action. Further, elements other than a controller are disclosed as performing the 'selecting' based on successful reception (*Id.* at 7:37-39 (describing "a **signal** on line 57 from the mobile station transceiver 4 indicating that the last packet **reception was a success**.")) Such signals do not provide structure sufficient to meet the requirements of a means for claim.

> **c.      'a controller . . . for controlling the transmission of data between the respective stations by selecting the preferred antenna at the respective stations'**

The specification fails to describe **any** hardware, components, source code, or algorithms for the 'controller,' which is described only by **function**. Such 'controller' is literally illustrated as a box with a table/register (for storing) and lines (for signals). Provided below, FIG. 3 and FIG. 5 respectively illustrate a "base controller" and "mobile controller" of the '035 Patent:



Such controllers are "black boxes" representing function, but lacking structure. *ePlus, Inc.*, 700 F. 3d at 518-19 (finding where "[t]here is no instruction for using a particular piece of hardware, employing a specific source code, or following a particular algorithm," "[t]here is therefore nothing in the specification to help cabin the scope of the functional language in the means for"). Although Netgear argues 'controller' should be construed as a device (D.I. 112 at 15.), the specification discloses no device embodiments, no device components, and no algorithms for

performing its device functions. Moreover, "device" is a nonce word, serving merely as a substitute for "means for." In that regard, "recitation of 'control device' provides no more structure than the term 'control means' itself." *Ergo Licensing,* 673 F.3d at 1364. The '035 'controller' lacks disclosed structure and is subject Section 112, paragraph 6.

The Federal Circuit has also explained that "[e]ven if we were to accept that one skilled in the art would understand a control device to be a general-purpose computer, the specification fails to disclose a corresponding algorithm required by [Federal Circuit] precedent." *Id*. There is no written description for any corresponding algorithms that are clearly linked to the specific type of selecting claimed here. The claim element is therefore invalid. *Id.*

> **d.      'means . . . to select one of the multiple antennas of that station as the preferred antenna in absence of said stored indicia'**

The applicants of the '035 Patent argue that this term refers to "random selection of antennas in absence of the specific preferred antenna information." (D.I. 114 at A-248-49.) There are no disclosed algorithms for such "random selection." This 'means for' element is therefore indefinite for lack of corresponding structure.

> **e.      'means for measuring received signal strength'**

The specification states only that measuring occurs "at" the transceiver, not that the transceiver structure does the measuring. ('035 at 2:20-22.) As such, the public is informed only that 'measuring' occurs and where it takes place. The '035 Patent therefore fails to disclose any structure clearly tied to the claimed function of 'measuring.' This 'means for' claim element is therefore invalid.

> **f.      'error correction means'**

The specification lacks any written description basis for "correction" of error, a limitation added by amendment, and thereby incapable of constituting its own written description by being

part of the original disclosure. (D.I. 114 at A-268.) The only reference to "error" in the specification refers to "computation of an error-detecting code, or checksum." ('035 at 5:28-29.) Notwithstanding the real difference between 'correction' and 'detecting'/ 'checksum,' no structure is disclosed as being clearly tied to the function of 'error correction.'

Netgear admits that "'error detection' can merely be '**part of** error correction'" or "**components of** error correction," thereby admitting "detecting" and 'correction' are not the same. (D.I. 124 at 15.) Just as disclosing a pedal does not disclose a bicycle, disclosing "error-detecting" does not disclose 'error correction.' Moreover, there are no algorithms disclosed for "codes or checksums," which therefore lack the structure required under §112, ¶6.

## IV.   <u>CONCLUSION</u>

Summary judgment is designed to secure a just, speedy, and inexpensive resolution in appropriate cases, including patent cases. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). For the reasons discussed above, each of the Patents-in-Suit are invalid for failing to comply with one or more of Section 101 of Title 35 or paragraphs one, two, or six of Title 35, Section 112. Because the asserted claims are invalid, the associated claim terms need not be construed and summary judgment is appropriate.

Dated: May 7, 2013                    Respectfully submitted,


                                      */s/ George Pazuniak*
                                      George Pazuniak (DE # 478)
                                      O'KELLY ERNST & BIELLI, LLC
                                      901 N. MARKET ST.
                                      SUITE 1000
                                      WILMINGTON, DE 19801
                                      TEL: 302-478-4230
                                      GP@del-iplaw.com

Colby B. Springer (admitted pro hac vice)
CSpringer@LRLaw.com
LEWIS AND ROCA LLP
2440 West El Camino Real, Sixth Floor
Mountain View, CA 94040

Shane E. Olafson (admitted pro hac vice)
SOlafson@LRLaw.com
W. Brent Rasmussen (admitted pro hac vice)
BRasmussen@LRLaw.com
LEWIS AND ROCA LLP
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004

*Attorneys for Defendant Ruckus Wireless Inc.*